[No. A103980. First Dist., Div. Four. Sept. 20, 2004.]

MARIE BOWMAN et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY, Defendant and Respondent;
AFFORDABLE HOUSING ASSOCIATES, Real Party in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.B.

## Counsel

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiffs and Appellants.

Richard Pettler for Berkeley Architectural Heritage Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Manuela Albuquerque, City Attorney, and Zach Cowan, Deputy City Attorney, for Defendant and Respondent.

Shute, Mihaly & Weinberger, Ellen J. Garber, Marc B. Mihaly and Jenny K. Harbine for Real Party in Interest.

Goldfarb & Lipman, Richard A. Judd and Rafael Mandelman for Sierra Club as Amicus Curiae on behalf of Defendant and Respondent and Real Party in Interest.

## Opinion

**KAY, P. J.**—Marie Bowman et al., as individuals and on behalf of Neighbors for Sensible Development for 2517 Sacramento Street (collectively the Neighbors), appeal from the judgment denying their petition for writ of mandate to overturn the resolution of the City of Berkeley (the City) authorizing Affordable Housing Associates (the Developer) to construct a housing complex for senior citizens (the Project). The Neighbors contend that the City erred under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] in adopting a mitigated negative declaration for the Project rather than preparing an environmental impact report (EIR), because there is substantial evidence that the Project may have significant environmental effects in the areas of aesthetics and hazardous materials. The Neighbors argue further that the City improperly calculated the density bonus to which the Project is entitled under Government Code section 65915, and that the City's zoning ordinance prohibits the number of parking spaces approved for the Project.

The principal issue is whether opinions that the building is too large to be aesthetically compatible with its surroundings constitute substantial evidence

---

[1] Unless otherwise indicated, all further statutory references are to the Public Resources Code.

supporting a fair argument that the Project will have a significant effect on the environment. Based primarily on the Project's environmental context, and the fact that the Project has undergone an extensive design review process to mitigate its visual impact, we hold that there is no environmentally significant aesthetic effect that requires an EIR in this instance. The Neighbors' other objections to the Project's approval also lack merit. Accordingly, we affirm the judgment denying their petition.

## I. BACKGROUND

The Project, known as "Outback Senior Homes," is to be built on the northeast corner of Sacramento and Blake Streets in Berkeley, currently occupied by a vacant one-story building that had been a clothing store. Sacramento Street is a divided four-lane road and "one of Berkeley's most heavily used thoroughfares." A two-story apartment building stands to the north along Sacramento Street, and there are single-family homes to the east along Blake Street and to the west across Sacramento. The property is a .41-acre lot at the Sacramento-Blake corner, with a strip along the eastern edge extending out to Dwight Way on the north, behind the adjacent apartment building. The lot is zoned South Area Commercial (C-SA), a designation that allows for a mixed-use, residential and commercial development.

The Project involves demolition of the existing building and construction of a mixed-use facility with retail space, 40 dwelling units—39 for low-income seniors and one for a building manager—and 18 parking spaces. The building will be four stories tall along Sacramento, with retail space on the first floor, and three stories tall along Blake, with common areas on the first floor. The residential units are on the upper floors, and include five units on the fourth story along Sacramento. The Project has undergone numerous design changes since it was originally proposed.

The Developer's application to the City for the Project permit was completed in November 2001. The application envisioned a three-story building with 38 units of affordable senior housing, commercial space on the first floor, and 13 parking spaces. The Developer indicated that it had approached people in the neighborhood in 1999 with a proposal for a four-story mixed-use building with housing for mixed-income families, but they had expressed serious concerns with the size of the Project and did not support a four-story building. In response to those concerns, the Developer decided after purchasing the Project site in 2000 to lower the structure to three stories, and to develop the property for low-income seniors. The Developer submitted that the Project would improve the lot's appearance, replacing gated parking lots and a graffiti scarred building of "no apparent

architectural value" with a structure "designed to reflect both the commercial streetscape on Sacramento and the residential environment on Blake Street."

Members of the public and the City's Design Review Committee (DRC) expressed their views on the design of the Project at a preliminary DRC hearing on November 15, 2001. The Developer submitted revised drawings on December 7, 2001, showing alternative elevations along Sacramento Street. When the Project was previewed to the City's Zoning Administration Board (ZAB) on December 13, 2001, the Developer indicated that it had changed the Project's design to address the DRC's comments. Under the revised plans, the building was stepped down to two stories near appellant Helene Hunter's residence on Blake, causing a loss of several units; additional units were added in a fourth story along Sacramento Street, for a net gain of three units. The Developer advised that the extra units were required to cover additional construction costs entailed by the new design. The Developer asked for "clear direction" from the ZAB on the new design and received positive responses from board members. Drawings for the new design were submitted on January 11, 2002.

On January 24, 2002, the City issued a proposed mitigated negative declaration for the Project, with measures listed to mitigate potentially significant impacts in the areas of noise, air quality, and geology/soils during construction, and in traffic into and out of the property. The attached environmental initial study concluded that the Project would have no impacts in the areas of aesthetics or hazardous materials.

The Project was briefly previewed for a second time to the ZAB on January 24, 2002. The Project architect went over the new design, which included a "hipped" rather than flat roof to reduce the building's perceived height. The architect noted that the building was now terraced down to two stories next to Hunter's home, and that the terracing increased the construction costs. The Project came before the DRC again on February 7, 2002. Members of the public again appeared and offered their comments. A majority of the DRC approved of the elevation and step down along Blake Street to the east, but did not support a fourth story along the full length of Sacramento.

The Project came before the ZAB for approval on February 14, 2002. The City staff reported that a use permit was required to enable the Project's dimensions to exceed limitations in the zoning ordinance, including: height (four stories and an average height of 47.5 feet along Sacramento Street, where a maximum of three stories and an average height of 36 feet were allowed); parking (12 spaces where 13 were required); lot coverage (64 percent where 45 percent was allowed); and setbacks (less than the required

minimums for front, side and rear yards). Staff recommended that the ZAB approve the permit and adopt a mitigated negative declaration under CEQA, with a finding that there was no substantial evidence that the Project, as mitigated, would have a significant effect on the environment.

The ZAB received numerous objections to the Project, including a 20-page single-spaced "Citizens' Report" from the "Neighbors for Sensible Development." This memorandum argued that an EIR was required because the Project would have potentially significant impacts in the areas of aesthetics, hazardous materials, hydrology and water quality, land use and planning, noise, population and housing, public services, and transportation and traffic. The memorandum also asserted among other things that the Project violated various provisions of the Berkeley Municipal Code (hereafter Ordinance), and that the City was incorrectly calculating the state density bonus for the Project. Petitions were lodged stating among other things: that there was no urgent need for affordable senior housing in Berkeley; that the Project site would be better used as a commercial facility; that the Project would have insufficient parking; that the Project would block sunlight to adjacent properties; that the Project would be out of scale with surrounding buildings; and that the Project would "open the door" to "even larger [developments] because of this precedent."

At the February 14, 2002, ZAB meeting, the Developer's architect reported that the Project could be redesigned to include an additional parking space, and to eliminate two units on the fourth floor, a two-bedroom unit could be split into two studio units, and the total number of residential units would be decreased from 41 to 40. After hearing speakers for and against the Project, and requiring additional design modifications, the ZAB voted unanimously to approve the use permit and adopt the mitigated negative declaration. The modifications, as described in City staff memoranda, "created a larger setback on the north side, to avoid shadowing the courtyard at the disabled housing project next door," "shifted certain units away from the Sacramento Street and north property lines, reduced the floor area at the fourth floor," and set the "building height at three stories on the east side, next to single-family homes."

Bowman appealed the ZAB's decision to the city council, repeating most of the allegations in the "Citizens' Report" to the ZAB. The appeal indicated among other things that neighboring residents and businesses "would support a 3-story mixed-use building on . . . Sacramento with 2 stories on Blake," but that there was "overwhelming opposition to the 4-story high density project proposed." On March 19, 2002, the city council voted to consider the appeal at a special meeting on May 7, 2002. At the May 7 meeting, after hearing extensive public comments on the Project, the city council referred the appeal

to mediation and continued the hearing to May 21. On May 21, the Developer and Bowman requested that the mediation be continued for another week, and the hearing on the appeal was continued to May 28.

On May 28, staff reported to the city council that three potential alternatives had emerged during the mediation, all of which included reconfiguration of the parking to add additional spaces. The first alternative, A-1, was simply the Project as then proposed but with the additional parking. The second alternative, A-2, eliminated two units to reduce shading of adjacent parcels; loss of the units would require an additional $100,000 subsidy from the City. The third alternative, B, eliminated four units and the fourth story, and would cost the City $300,000. All of the alternatives were acceptable to the Developer, but alternative B, the three-story option, was the "only one that the neighborhood could find acceptable as the basis for further mediation."

At its May 28, 2002, meeting, the city council voted to uphold the ZAB decision approving the permit and adopting the mitigated negative declaration for the Project, with the condition (alternative A-1) that parking be redesigned to add two to five spaces. Revised drawings submitted in June 2002 increased the parking spaces for the Project to 18. To gain the additional parking spaces, vehicles would enter and exit on Sacramento Street, rather than exiting on Dwight Way as previously planned, and the area out to Dwight behind the adjacent apartment building was designated for landscaping, rather than as a driveway, on the final plans.

The Neighbors filed their petition for writ of mandate herein in July 2002, alleging among other things that they did not attend the May 28 city council meeting because they thought they were involved in ongoing mediation. In February 2003, the court granted the petition in part, finding that the Neighbors did not receive a fair hearing when the city council approved the Project at the May 28 meeting, and ordered that the approvals be set aside.

The matter was set for a new hearing before the city council on March 11, 2003. Further voluminous submissions were lodged against the Project. The environmental initial study was updated to reflect the design changes to the Project, but continued to conclude that the Project as mitigated would have no significant effect on the environment. After hearing from 38 speakers at the March 11, 2003 meeting, the city council voted seven to two to approve the use permit and adopt the mitigated negative declaration for the Project. The city council resolution found with respect to CEQA that none of the comments in the public review period had raised any environmental impacts that were not already identified and analyzed in the initial study, and reduced to insignificance in the mitigated negative declaration; thus, no EIR was required.

The City's return reporting the Project's reapproval was filed in the trial court on March 19, 2003. The petition for writ of mandate to vacate the City's decision was denied by order filed June 26, 2003, and the Neighbors have appealed from the ensuing judgment against them.

## II. DISCUSSION

### A. *Environmental Issues*

#### (1) *CEQA Standards*

The Neighbors contend that an EIR must be prepared because the Project may have significant environmental effects in the areas of hazardous materials and aesthetics. "If there is substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment, an environmental impact report shall be prepared." (§ 21080, subd. (d); see also § 21151, subd. (a).) Section 21060.5 defines "environment" as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) A "significant effect" is a "substantial, or potentially substantial, adverse change[] in physical conditions which exist within the area as defined in Section 21060.5." (§ 21151, subd. (b).)

■ There is "a low threshold requirement for preparation of an EIR" (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84 [118 Cal.Rptr. 34, 529 P.2d 66]), and a "preference for resolving doubts in favor of environmental review" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316–1317 [8 Cal.Rptr.2d 473]). An EIR must be prepared "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact" (*No Oil, Inc., supra,* at p. 75), even if there is substantial evidence to the contrary (*Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1346 [125 Cal.Rptr.2d 140]; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514]).

■ Application of the "fair argument" test is a question of law for our independent review. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 617 [49 Cal.Rptr.2d 494]; *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602 [35 Cal.Rptr.2d 470].) We review the trial court's findings and conclusions de novo (*Arviv Enterprises, Inc. v. South Valley Area Planning Com., supra,* 101 Cal.App.4th at p. 1346), and do not defer to the agency's determination (*Sierra Club v. County of Sonoma, supra,* 6

Cal.App.4th at p. 1318), except on "legitimate, disputed issues of credibility" (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* at p. 1603; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1349 [272 Cal.Rptr. 372]).

(2) *Hazardous Materials*

The Developer submitted a November 2000 "phase I environmental site assessment" by ACC Environmental Consultants (ACC) that considered "the presence or likely presence of any hazardous substances or petroleum products" on the premises. The assessment reads in pertinent part: "According to records on file at the City of Berkeley Toxics Management Division, [the property on the Project's north border] was occupied by a gasoline service station from 1949 to 1993. Soil samples collected during tank removal revealed the presence of hydrocarbon-impacted soil. Extensive over-excavation was performed at this site. Two exploratory borings and ten groundwater-monitoring wells were installed at this site. Quarterly groundwater monitoring was performed at this site from 1990 until 1997. Analysis of samples collected from down and cross gradient wells indicates no significant offsite migration of constituents. Based on the analytical results of the quarterly monitoring, Kaprealian Engineering [KEI] determined that the hydrocarbon-impacted soil and groundwater is well defined and limited in both degree and extent. This site was granted case closure by the City of Berkeley Toxics Management Division in April 1997. Based on this information, the potential to impact the subject property is considered to be low."

The environmental initial study attached to the original January 2002 mitigated negative declaration found that the Project would have no impact in the area of hazardous materials. The initial study asked whether the project would "create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment," and answered "No. There are no hazardous materials associated with this project. The buildings on the property have been used as a grocery store, a greenhouse, office space, and retail space (Outback Clothing Store) for a number of years. There is no evidence of any hazardous material contamination on the site from any of these uses. In addition, there is no evidence of underground storage tanks or other possible sources of contamination on the project site."

In a submission for the February 14, 2002, ZAB meeting, the Neighbors asserted that the former gas station "was known to have leaking gas tanks which drained into the soil for 20+ years," and argued that soils should be tested for contamination. These points were repeated in Bowman's appeal of the ZAB decision to the city council. City staff responded in a memorandum

for the March 19, 2002, city council meeting that the gas station property had been remediated, and that the ACC assessment had determined that there were no hazardous materials on the Project site.

When the matter was returned to the city council in 2003 for reapproval of the Project, appellant Robert Baum submitted copies of 1995 and 1997 reports by KEI to Unocal Corporation on soil testing and remediation at the gas station property, and 1993 violation notices from the City to Unocal involving soil aeration at that property. Baum's analysis of the KEI reports disputed ACC's conclusion that the Project site was unlikely to be contaminated with hazardous materials from the gas station property. Bowman submitted an e-mail from Rash B. Gosh, Ph.D., a Berkeley resident then out of the country, who stated that he had worked for the California Environmental Protection Agency and had been in charge of toxic waste sites. Gosh said he had reviewed the KEI reports, found them incomplete, and thought that the Project site should be tested for hydrocarbon contaminants and the chemical MBTE before it was approved for residential use.

The City staff response repeated the points in its March 2002 memorandum, and the initial study's treatment of hazardous materials was not changed when the study was updated to reflect the Project's amended design. At the 2003 city council meeting, staff opined that Gosh was not credible given misrepresentations he had made in proceedings for "nuisance abatement" of his property and his violations of the City zoning ordinance.

On appeal, the Neighbors read the KEI reports differently than ACC. ACC concluded from the reports that there was a "low" potential for contamination of the Project's parcel with hazardous materials from the gas station property. The Neighbors note that KEI's 1995 report found contamination in two monitoring wells on the gas station property, "MW4" and "MW6," that were near the north and northeastern boundaries of the Project site. KEI wanted to install a monitoring well, MW11, on the Project site near MW6, but the former owner evidently would not provide access: MW11 is labeled "proposed-access denied" on the map of the wells in the 1995 report. KEI's 1997 report indicated that hydrocarbon-impacted soil remained in the vicinity of MW6, and that "the proximity of MW6 to the eastern property line makes excavation in this area unfeasible. . . . [¶] . . . [¶] The extent of hydrocarbon-impacted ground water appears to be well defined and predominantly limited to the vicinity of MW4." The Neighbors submit that the contamination found near the border of the Project site was "unlikely to magically stop at the property line," and they think it reasonable to assume, based on the KEI reports, that the contamination may have spread to the Project site.

The Developer counters with statements in the 1997 report: that "predominantly or completely non-detectable [sic] concentrations of TPH as gasoline

and BTEX" had been found in "[d]owngradient monitoring wells" off the gas station property; that concentrations of dissolved hydrocarbons were expected to continue to decrease "due to natural attenuation (dispersion, absorption, biodegradation, and volatilization)"; and that the "plume" appeared to be very limited and stable, and did not appear to be migrating. The Developer notes also that the area of the Project next to MW6, which appears to be the Neighbors' principal concern, is an area set aside by the Project for landscaping rather than construction.

ACC's reading of the KEI reports provides substantial evidence that the Project will have no significant environmental effect involving hazardous materials. (*National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1362 [84 Cal.Rptr.2d 563] ["an expert can make a judgment on existing evidence, without further study, that a particular condition will have no significant impact"].) The Neighbors lay reading of these reports does not constitute substantial evidence supporting a fair argument for a contrary conclusion. (§ 21080, subd. (e)(2) ["argument, speculation, unsubstantiated opinion or narrative" are not substantial evidence].)

 Statements of area residents who are not environmental experts may qualify as substantial evidence if they are based on relevant personal observations or involve "nontechnical" issues. (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 [10 Cal.Rptr.3d 451] [aesthetics]; *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 882 [274 Cal.Rptr. 720] [noise]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 172 [217 Cal.Rptr. 893] [traffic].) However, a complex scientific issue such as the migration of chemicals through land calls for expert evaluation, and the Neighbors do not profess any expertise that would qualify them to opine on that subject. (See *Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 281 [254 Cal.Rptr. 778] [opinions outside area of expertise do not constitute substantial evidence].) The only expert opinion that might have substantiated the Neighbors' concerns was offered by Dr. Gosh, but the City had discretion to discount his credibility (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* 29 Cal.App.4th at p. 1602; *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1349) and the Neighbors do not rely on his opinion on appeal. Accordingly, ACC's conclusion that there was a "low" potential for contamination from hazardous materials from the adjacent property stands unrefuted, and an EIR is not required to address the subject. (Cal. Code Regs., tit. 14, § 15000 et seq., hereafter Guidelines; compare Guidelines, § 15064, subd. (g) [conflicting expert opinions on the significance of an environmental effect ordinarily mandate preparation of an EIR].)

### (3) *Aesthetics*

The Neighbors argue that the Project will have a significant adverse aesthetic effect on the environment. One of CEQA's stated purposes is "to provide the people of this state with . . . enjoyment of aesthetic, natural, scenic, and historic environmental qualities" (§ 21001, subd. (b)), and aesthetic issues are among those that are "properly studied in an EIR" (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492 [14 Cal.Rptr.3d 308]; *National Parks & Conservation Assn. v. County of Riverside, supra,* 71 Cal.App.4th at p. 1360). As relevant here, the Guidelines give content to the concept of aesthetics by including the following questions in the checklist of a project's potential environmental effects: "Would the project have a substantial adverse effect on a scenic vista?" and "Would the project substantially degrade the existing visual character or quality of the site and its surroundings?" (Guidelines, Appen. G, questions I(a) and I(c).)

The City's environmental study for the Project found "no impact" in either of these areas. The environmental study answered the question about scenic vistas: "No. The site and surrounding areas is [*sic*] generally flat, and therefore the project will not have an adverse impact on scenic vistas—specifically the Berkeley Hills or the San Francisco Bay." In response to the argument in Bowman's appeal to the city council that the Project would interfere with views of the Berkeley hills to the east of the Project, the City staff opined that there would be a "negligible" effect on such views "[g]iven the width of Sacramento Street and the fact that the closest residential properties are to the east of the site."

As for visual degradation, the City study stated: "The site is currently a vacant building on a lot. This building is currently underutilized and in need of significant rehabilitation, including a new roof. The proposed project consists of a new building that would include ground floor shops and [three] floors of residential units. This new building will enhance this area by adding activity to the area and 'eyes on the street.' Given the poor quality of the existing site, the proposed building could not degrade the existing visual character. Construction of this project is subject to design review and approval prior to issuance of building permits."

The city council resolution approving the Project added detailed findings under the City Ordinance on the merits of the Project's design. The resolution found that the Project would not be "detrimental or injurious to property and improvements of the adjacent properties, the surrounding area or neighborhood or to the general welfare of the City" because, among other things:

"A. The demolition would remove a vacant commercial building that has become an attractive nuisance, serves no purpose, generates no tax revenue

beyond property taxes, and has a blighting effect on surrounding residential and commercial properties.

"B. The design of the new project, as modified by the [ZAB], ensures adequate provision of sun, light and air to adjacent residential properties to the east and reduces shadowing to the courtyard of the multi-family structure to the north because the tallest (four-story) portion of the building is located on the southwestern side of the property, more than 50 feet from the eastern property line. On balance, any detriment resulting from the shadowing that will be created by the project is outweighed by the benefit of providing 40 additional dwelling units including 39 reserved for low and very-low income senior households."

The city council found the Project to be "compatible in design and character" with the C-SA zoning district and adjacent residential neighborhoods for a number of reasons:

"1. The project has been designed to shift the bulk of the development to the west and toward Sacramento Street commercial frontage and more than 50 feet away from the lower density residential area to the east.

"2. The additional height on the Sacramento Street frontage is appropriate given the 110-foot right-of-way. The design of the Sacramento facade, including the orientation of the commercial entrance, will provide visual interest and a focal point for this part of the district. With the addition of new street trees, the project will significantly improve the appearance of the area, enhancing the quality of the environment for surrounding residents.

"3. The hipped-roof design of the building reflects the architecture of many of the Craftsman and California bungalows in the immediate area. Moreover, the varying roof shapes and heights help to reduce the apparent bulk and create an appearance that fits into an area with residential buildings of different heights and varying roof styles.

"4. The reduced setback along Sacramento Street permits consistency with the building setback existing on the adjacent lot to the north and encourages pedestrian activity in an area that the General Plan classifies as neighborhood commercial where a residential building setback would not be appropriate or serve a useful purpose.

"5. The residential portion of the building facing Blake Street . . . is set back 20 feet to conform with the lower density residential properties to the east, and is enhanced by a front porch and landscaping that will minimize the structure's bulk. With an average height of 35.5 feet, 20-foot setback, and

10-foot east-side setback, this three-story part of the building is compatible with the type of development permitted in the abutting R-2 District, where a three-story 35-foot high structure with front and side setbacks of 20 and 6 feet, respectively, would be allowed subject to the approval of a Use Permit.

"6. By shifting the higher portions of the building to the southwest and away from the multi-family building to the north as well as the single-family residential structures to the east, the design minimizes shadowing impacts on adjacent residential properties."

The Neighbors' aesthetic objections are focused on the scale of the Project. The Neighbors contend that, by virtue of its size, the building will shade adjacent properties, will interfere with scenic views, and will be visually incompatible with its surroundings.

■ The Neighbors' briefs do not discuss any cases involving shadow impacts. We presume that many if not most urban developments will have some shading effects on nearby properties, and that those effects, if sufficiently substantial, could represent a significant environmental impact. (Cf. *A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 642, fn. 8 [20 Cal.Rptr.2d 228] [EIR for 40-story office building that was first phase of larger development allegedly failed to properly evaluate shadows from the six "skyscrapers" planned]; *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1786 [16 Cal.Rptr.2d 358] [shadow impact of three office towers, a 600-room hotel, and a mid-rise building was fully mitigated].) Here, architect Catherine Roha prepared shadow studies showing that the Project would cast some shade on appellant Hunter's house and yard to the east, and on the courtyard of the apartment building to the north. As has been noted, the tallest parts of the Project were moved away from these properties to minimize shadow impacts. The Developer submitted shadow studies showing that Hunter's house would be shaded only in the late afternoon, primarily on its garage door, and that shadows from the Project over the courtyard of the apartment building would merely overlap and not darken those created by the apartment building itself. Roha's analysis did not refute these specific conclusions, and given the limited scope of the shadows involved, we find no substantial evidence to support a fair argument that the Project as mitigated will have any significant shading effect.

■ A project that interferes with scenic views has an adverse aesthetic effect on the environment. (See, e.g., *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra,* 116 Cal.App.4th at p. 401.) However, obstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact. (See *id.* at p. 402 [that a project affects "only a few private views" suggests that its impact is

insignificant]; *Mira Mar Mobile Community v. City of Oceanside, supra,* 119 Cal.App.4th at pp. 492–493 [distinguishing public and private views; "[u]nder CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons"]; *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 734 [3 Cal.Rptr.2d 488] [views of "only a few of the neighbors," not "persons generally," were affected]; compare *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* 29 Cal.App.4th at pp. 1603–1604 [blocking of view from public park].) The only view at stake in this flat urban neighborhood is that of the Berkeley hills to the east of the Project. It appears that some nearby residents may have that view diminished by the Project, but as the City pointed out, the neighbors to the east will be unaffected, and relatively few to the west will be affected because of the width of Sacramento Street. Given the limited scope of the impact, the Project's effect on scenic views cannot be considered environmentally significant.

The Neighbors' chief objection to the scale of the Project is the purely aesthetic one that it is out of character with its surroundings. Petitions were submitted arguing that the Project would "spoil the attractive visual character of our low-rise neighborhood." One area resident called the building "a Costco-sized box on a Monterey Market-sized plot," and others complained: that there was "nothing . . . this massive for as far as you can see in any direction"; that the building would be "completely out of scale with the surrounding one- and two-story homes and businesses"; and that the building would be "a monstrosity, not fitting into the fabric of the neighborhood." A city council member observed that all of the surrounding buildings were "much, much smaller," and another called the Project "plain too big." Some DRC members thought that the Project would be "out of scale" and "too massive," and some local architects shared that opinion. One architect called the Project "grossly over-scaled for the neighborhood"; another thought that the building would "stand out like a sore thumb for 100 years"; another was "just speechless" at "the size of this thing," and found it "mind-boggling" that the City would "even consider" it.

Similar views were expounded at length by architect Richard King in a March 2003 letter to the city council: "The project site is located in a mostly 1 story, 1920's craftsman and McGregor style neighborhood that is defined by small homes, tightly arranged with low roof lines, yet wonderfully articulated and varied through projecting porches, recessed entries, wood fences, watertables near ground level, and setbacks providing landscaping variations and opportunities that define, knit together and set up the urban rhythm of this neighborhood. . . . [¶] . . . [T]his project is so out of scale and aesthetically so out of character for this neighborhood that the effects resonate well beyond just the adjacent properties. . . . [¶] . . . When people move through our neighborhood, views of the sky, the trees, the houses, the bay,

and the hills appear and reappear through the rhythm of a 25 or 30 foot wide 1-story house, followed by a 10-15 foot landscaped area or open driveway and so on and so on with the canopy of trees soaring well above the height of any of the homes or businesses. The Outback project will create a wall that will reflect and reverberate noise and significantly divide the neighborhood in half. . . . [¶] . . . [¶] This project needs to be drastically reduced in scale to conform to the existing condition. . . . The building needs to be reduced in height a minimum of 1 story on both Sacramento and Blake Street . . . ."

In a report to the DRC for the November 2001 meeting, City staff opined that "[i]n general, the height of adjacent buildings especially historic structures should be respected in the design of new buildings," but that "abrupt changes in height may be appropriate, even desirable, in certain situations, such as the need for focal points, landmarks, and the closure of long views." An architect who spoke in favor of the Project at the March 2003 city council meeting thought that a large building was needed on the Project site. She thought that the building would "look really beautiful and is going to really mark this area and provide a real focal point for the neighborhood," and she could not understand why people thought the Project was not to scale given the width of the Sacramento Street transit corridor. In response to King's March 2003 letter, City staff argued that "[g]iven the project's location on Sacramento Street—one of Berkeley's most heavily used thoroughfares— one-half block from the intersection of a collector street that is also designated as a Secondary Transit Route, the building's size and height are appropriate."

The Neighbors submit that the objections of architect King and others to the building's size are substantial evidence that the Project may have a significant aesthetic effect on the environment. In the appeal to the city council and in the mediation the Council ordered, the Neighbors endorsed a building that would be three stories along Sacramento rather than four, and two stories along Blake rather than three. Thus, despite the tone of some of the rhetoric on the Project's scale, the Neighbors' position boils down to the claim that an EIR is required because the building is one story too tall.

In support of that contention, the Neighbors offer string cites to nine cases that have required EIR's for "modestly-sized housing projects" or have "considered and respected project aesthetics." The Neighbors also rely on the recent decision in *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra,* 116 Cal.App.4th 396. Some of the Neighbors' cases did not involve aesthetic impacts and require no discussion. (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092 [131 Cal.Rptr.2d 379]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 [104 Cal.Rptr.2d 326]; *Greenebaum v. City of Los*

*Angeles* (1984) 153 Cal.App.3d 391 [200 Cal.Rptr. 237].) Other cases involved aesthetic impacts that are readily distinguishable from the one alleged here, such as scenic views (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra,* at p. 402 [view of reservoir from public hiking trails]; *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* 29 Cal.App.4th at pp. 1603–1604 [view of ocean from public park]), and 300-foot high "cut and fill slopes" from a rock quarry (*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 [91 Cal.Rptr.2d 322]). The remaining cases also offer little, if any, support for the Neighbors' theory.

In *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 712, 714 , an EIR for construction of 46 homes on 10 acres of undeveloped land in the Oakland hills found that the only significant environmental effect of the project would be its "impact on visual resources." The EIR defined " 'visual resources and visual quality' " as " 'human perceptions of combining form, bulk, scale, texture, color, and viewing range of a site, relative to the context of its locale' " (*id.* at p. 712), and acknowledged that any major development of the parcel would alter " 'the existing open space visual character of the site vicinity' " (*id.* at p. 714).

Because an EIR was prepared in *Sequoyah Hills,* the court was not called upon to decide when an aesthetic impact qualifies as a significant environmental effect and the decision is essentially irrelevant for our purposes. The significance of an environmental impact is in any event measured in light of the context where it occurs. The Guidelines confirm that "the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b); see also, e.g., *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1107 [11 Cal.Rptr.3d 104] ["[t]here is no 'gold standard' for determining whether a given impact may be significant"]; *Mira Mar Mobile Community v. City of Oceanside, supra,* 119 Cal.App.4th at p. 493; Guidelines, § 15300.2 ["a project that is ordinarily insignificant in its impact on the environment may in a particularly sensitive environment be significant"].) To conclude that replacement of a virgin hillside with a housing project constitutes a significant visual impact says little about the environmental significance of the appearance of a building in an area that is already highly developed.

Context also distinguishes the aesthetic impacts discussed in *Eller Media Co. v. Community Redevelopment Agency* (2003) 108 Cal.App.4th 25 [133 Cal.Rptr.2d 324] and *Arviv Enterprises, Inc. v. South Valley Area Planning Com., supra,* 101 Cal.App.4th 1333. *Eller Media* involved erection of billboards next to historic structures along a street that had been designated

by the municipality as a " 'Major Scenic Highway.' " (*Eller Media Co. v. Community Redevelopment Agency, supra,* at pp. 35, 41, 44, fn. 7.) *Arviv Enterprises* involved construction of 21 homes in an environmentally "sensitive hillside area" in a "Scenic Parkway" district. (*Arviv Enterprises, Inc. v. South Valley Area Planning Com., supra,* at pp. 1336, 1347.) In contrast, the Project here is not located in an environmentally sensitive area, and it does not implicate any historical[2] or scenic resources.

In *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 882 [92 Cal.Rptr.2d 268], an EIR was required in order to address "the architectural and aesthetic impacts" of a carwash in a shopping center. While this conclusion could potentially have helped the Neighbors' case, the court did not publish the portion of the opinion that explained why the impact in question was environmentally significant. Consequently, the *Woodward Park* case does not stand as a precedent for the result the Neighbors advocate.

We have fared no better than the Neighbors in finding any California case on point. In *Native Sun/Lyon Communities v. City of Escondido* (1993) 15 Cal.App.4th 892, 896 [19 Cal.Rptr.2d 344], an EIR for a 102-unit residential development on unimproved property found that the project would have significant environmental impacts in the areas of aesthetics, traffic, and solid waste, among others. The EIR found that the project would have a significant visual impact because the " 'building materials and layout [were] inconsistent with the existing rural residential neighborhood to the north . . . .' " (*Id.* at p. 907.) The EIR for an apartment building in *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1017–1018 [162 Cal.Rptr. 224], discussed aesthetic, traffic and density impacts, and found that the project as originally proposed would have had an adverse aesthetic effect because it appeared to be " 'too regimented, dense and "boxy." ' " (*Id.* at p. 1017.) Although these cases suggest that a building's appearance and compatibility with neighboring structures could qualify as environmental impacts, the courts were not required to determine when such impacts would be sufficiently significant to mandate an EIR, much less whether an EIR could be required solely because of such impacts. Similarly, while the EIR for an urban building in *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 902, fn. 4 [165 Cal.Rptr. 401], apparently analyzed the aesthetic merits of the building's design, that discussion may have involved local law issues rather than impacts considered environmentally significant. (See generally Guidelines, § 15125, subd. (d) [EIR must discuss inconsistency with general plan];

---

[2] We decline to consider facts outside the administrative record cited in the amicus curiae brief of the Berkeley Architectural Heritage Association in opposition to the Project. (See *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 118 [99 Cal.Rptr.2d 378].)

Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 12.32, p. 494 [EIR may discuss zoning issues].)

The only case we have found that has squarely addressed an issue like the one before us is *Maryland-National Cap. Pk. & Pl. Com'n. v. U.S. Postal Serv.* (D.C. Cir. 1973) 159 U.S. App. D.C. 158 [487 F.2d 1029] (*Maryland-National*). The *Maryland-National* decision construed the National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et seq.), which, like CEQA, includes an aesthetic component (42 U.S.C. § 4331(b)(2) [federal policy of assuring that all Americans enjoy "esthetically . . . pleasing surroundings"]). CEQA was patterned on NEPA (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049]), and NEPA cases can be persuasive authority for interpreting CEQA (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 201 [132 Cal.Rptr. 377, 553 P.2d 537]; *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 732 [12 Cal.Rptr.2d 785], disapproved on another point in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268]).

In *Maryland-National,* an injunction was sought against construction of a mail processing facility on the ground that an environmental impact statement (EIS), the NEPA equivalent of an EIR (Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 34), was necessary to assess the project's visual impact on motorists on an adjacent freeway. The court concluded that an EIS for that purpose was not required. The court distinguished situations involving "use of recreation areas" and "interference with an unencumbered view of an attractive scenic expanse" (*Maryland-National, supra,* 487 F.2d at p. 1038, fn. 5), and reasoned in relevant part:

"That some, or perhaps all, environmental impacts have an esthetic facet, does not mean that all adverse esthetic impacts affect environment. That is neither good logic nor good law. Some questions of esthetics do not seem to lend themselves to the detailed analysis required under NEPA for a § 102(C) impact statement. Like psychological factors they 'are not readily translatable into concrete measuring rods.' [Citation.] The difficulty in precisely defining what is beautiful cannot stand in the way of expressions of community choice through zoning regulation. [Citation.] But the difficulties have a bearing on the intention of Congress, and whether it contemplated, for example, a requirement of a detailed 'environmental impact statement,' and concomitant investigation, because of the possibility that each new Federal construction would be ugly to some, or even most, beholders, on such issues as: Is this proposed building beautiful? Or, what is the esthetic effect of placing the 'controversial' Picasso statue in front of the Civic Center building in

Chicago? These types of problems lead us to conclude that a 'substantial inquiry' or 'hard look' was not contemplated, as a matter of reasonable construction of NEPA, where the claim of NEPA application is focused on alleged esthetic impact and the matters at hand pertain essentially to issues of individual and potentially diverse tastes." (*Maryland-National, supra,* 487 F.2d at pp. 1038–1039, fn. omitted; accord, *River Rd. Alli. v. Corps. of Eng. of U.S. Army* (7th Cir. 1985) 764 F.2d 445, 451 ["[a]esthetic objections alone will rarely compel the preparation of an [EIS]"].)

■ Where scenic views or environmentally sensitive areas are concerned, aesthetic considerations are not discounted as environmental impacts merely because they involve subjective judgments. (*Maryland-National, supra,* 487 F.2d at p. 1038, fn. 5, distinguishing *Goose Hollow Foothills League v. Romney* (D.Ore. 1971) 334 F.Supp. 877 [scenic view]; *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra,* 116 Cal.App.4th at p. 402 [scenic view]; *Olmsted Citizens for a Better Community v. U.S.* (8th Cir. 1986) 793 F.2d 201, 206 [distinguishing aesthetic impacts in "a pristine wilderness area" from those in "an urban city block"]; see generally *Sequoyah Hills Homeowners Assn. v. City of Oakland, supra,* 23 Cal.App.4th at pp. 712–713 [EIR stating that visual quality is " 'essentially subjective' "]; Karp, *The Evolving Meaning of Aesthetics in Land-Use Regulation* (1990) 15 Colum. J. Envtl. L. 307 [concept of aesthetics "is perhaps more amenable to poetic contemplation than to legal analysis"]; but see Note, *Beyond the Eye of the Beholder: Aesthetics and Objectivity* (1973) 71 Mich. L.Rev. 1438, 1442–1447 [arguing that aesthetic evaluations can be justified objectively, e.g., by the consensus reflected in a study showing "very strong agreement on the aesthetic superiority of natural over urban settings"].) But we do not believe that our Legislature in enacting CEQA, any more than Congress in enacting NEPA, intended to require an EIR where the sole environmental impact is the aesthetic merit of a building in a highly developed area. (*Maryland-National, supra,* at pp. 1038–1039; *Wildlife Alive v. Chickering, supra,* 18 Cal.3d at p. 201; *Del Mar Terrace Conservancy, Inc. v. City Council, supra,* 10 Cal.App.4th at p. 732.) To rule otherwise would mean that an EIR would be required for every urban building project that is not exempt under CEQA if enough people could be marshaled to complain about how it will look. While there may be situations where it is unclear whether an aesthetic impact like the one alleged here arises in a "particularly sensitive" context (Guidelines, § 15300.2) where it could be considered environmentally significant, this case does not test that boundary. The aesthetic difference between a four-story and a three-story building on a commercial lot on a major thoroughfare in a developed urban area is not a significant environmental impact, even under the fair argument standard.

■ In reaching this conclusion, we are cognizant of the rule that CEQA is to be liberally construed for the protection of the environment. (*Laurel*

*Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) Like all laws, however, CEQA should be given a reasonable and practical construction (see *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876]), and we discern no practical benefit to be derived from further review, under the guise of environmental law, of the Project's aesthetic merits.

The record establishes that the Project has already been subject to thorough design review. "Virtually every city in this state has enacted zoning ordinances for the purpose of improving the appearance of the urban environment" (*Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 862 [164 Cal.Rptr. 510, 610 P.2d 407], revd. in *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882]), and architectural or design review ordinances, adopted "solely to protect aesthetics," are increasingly common (Manaster, et al., Cal. Environmental Law and Land Use Practice (2004) § 60.11[6], p. 60-17). While those local laws obviously do not preempt CEQA, we agree with the Developer and the amicus curiae brief of the Sierra Club in support of the Project that aesthetic issues like the one raised here are ordinarily the province of local design review, not CEQA. That the cases addressing such issues have arisen under local ordinances rather than CEQA is supportive of that view. (*Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 172–173 [81 Cal.Rptr.2d 324] [permit to build addition to residence denied under ordinance requiring that the design be " 'harmonious with . . . the surrounding neighborhood' "]; *Dore v. County of Ventura* (1994) 23 Cal.App.4th 320, 324 [28 Cal.Rptr.2d 299] [permit to build commercial building denied under local ordinance requiring "compatib[ility] with the character of surrounding development"]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336 [25 Cal.Rptr.2d 842] [permit to build residential second unit denied under ordinance requiring that unit be " 'architecturally compatible with overall neighborhood character and the primary residence in terms of scale' "]; *Guinnane v. San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 735, fn. 2, 742–743 [257 Cal.Rptr. 742] [proposed residence was " 'not in character' " with surrounding development because it was " 'significantly more massive and of a larger scale than adjoining dwellings' "; city "went beyond environmental concerns and focused instead on the suitability of the project within the affected neighborhood" when it denied the permit notwithstanding prior approval of a negative declaration].)

■ Here, the City found that the Project would not "[s]ubstantially degrade the existing visual character or quality of the site and its surroundings" within the meaning of Appendix G of the Guidelines in part because "[c]onstruction of this project is subject to design review and approval prior to issuance of building permits." This finding was supported by the record of extensive design review in this case, was sufficient to address the Guideline

criterion, and was consistent with a reasonable and practical reading of CEQA. Where a project must undergo design review under local law, that process itself can be found to mitigate purely aesthetic impacts to insignificance, even if some people are dissatisfied with the outcome. A contrary holding that mandated redundant analysis would only produce needless delay and expense.

B. *Other Issues*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment is affirmed.

Reardon, J., and Rivera, J., concurred.

A petition for a rehearing was denied October 14, 2004.

---

[*]See footnote, *ante*, page 572.