Filed 4/30/14; pub. order 5/30/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAN FRANCISCO BEAUTIFUL et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO et al., <br><br>     Defendants and Respondents; <br><br><br> AT&T CALIFORNIA, <br><br>     Real Party in Interest. | A136546 <br><br> (San Francisco County <br> Super. Ct. No. CPF11511535) |

AT&T California (AT&T) proposes to install 726 metal utility boxes housing telecommunications equipment on San Francisco sidewalks in order to expand its fiber-optic network (the project). The City and County of San Francisco (the City) approved the project without requiring an environmental impact report (EIR) to be prepared pursuant to the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq.) (CEQA), based on its conclusion that the project fell within a categorical exemption. Plaintiffs[2] sought a petition for writ of mandate, which the trial court denied. We shall affirm the judgment.

## I. BACKGROUND

---

[1] All undesignated statutory references are to the Public Resources Code.

[2] Plaintiffs and appellants are San Francisco Beautiful, San Francisco Tomorrow, Dogpatch Neighborhood Association, Potrero Boosters Neighborhood Association, and Duboce Triangle Neighborhood Association.

1

AT&T applied for a categorical exemption for its "Lightspeed" project, which is intended to upgrade broadband speed and capabilities based on internet protocol technology, using an expanded fiber-optic network. It would connect the fiber to electronic components located in 726 new utility cabinets on public sidewalks. The majority of the cabinets would be approximately 48 inches high, 51.7 inches wide, and 26 inches deep. The new cabinets would be "paired" with—or placed within 300 feet of—existing AT&T utility cabinets. AT&T has not yet determined precisely where the new utility cabinets will be located.[3]

In 2007, AT&T sought a categorical exemption from CEQA review for an earlier version of the project, which would have included approximately 850 utility cabinets. The San Francisco Planning Department, in case number 2007.1350E, determined the project was exempt pursuant to section 15303(d) of the State CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines).)[4]

The president of a neighborhood association appealed the Planning Department's decision to the City's Board of Supervisors. The Board of Supervisors held a public hearing in 2008, at which counsel for the appellant and numerous members of the public expressed concern that the utility cabinets would be large and unsightly, would attract graffiti and public urination, would block pedestrian access to sidewalks and parked cars, and would create traffic hazards by reducing visibility. At the conclusion of the meeting, AT&T acknowledged that it needed to respond to public concerns, and withdrew its application.

---

[3] Public Utilities Code section 7901 provides that telephone corporations may construct telephone lines along any public road or highway, as well as "necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road."

[4] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

After revising its proposal, AT&T submitted a new application for a categorical exemption in 2010. AT&T had reduced the number of proposed cabinets from 850 to 726, reduced the size of the proposed cabinets, increased the distance between the new cabinets and existing cabinets so as to provide more flexibility in cabinet location, eliminated the proposal to add new facilities within historic districts, promised to work with the City to screen the cabinets, promised to affix to each cabinet a 24-hour-a-day contact number for reporting graffiti directly to AT&T, and developed processes for members of the public to report graffiti through the City's "311" system and for AT&T personnel to report and remove graffiti. In its application materials, AT&T committed to adhering to certain limitations when choosing locations for the cabinets. Among them, the cabinets would not block pedestrian access and would maintain four feet of clearance, would not intrude on pedestrian "clear zones" at street corners, would have minimum setbacks at corners, curbs, fire hydrants, and other above-ground structures, and would not obstruct views of traffic signs, wayfinding signs, or traffic signals. AT&T also committed to use a graffiti-resistant coating on the cabinets and to work with the City, property owners, and community groups to install screening and allow for trees and shrubs to be planted next to the cabinets. In case number 2010.0944E, the City's Planning Department again determined the project was categorically exempt from environmental review.

San Francisco Beautiful and another organization, the Planning Association for the Richmond, appealed the Planning Department's determination. Members of the public submitted comments arguing that the cabinets were too bulky, would be eyesores, would attract vandalism, urination, graffiti, and trash, and would block visibility for pedestrians and drivers. In a six-to-five vote, the Board of Supervisors affirmed the Planning Commission's determination. During this process, AT&T provided a memorandum of understanding (MOU) to the City in which it "voluntarily" agreed, inter alia, to provide notice to neighbors and conduct community meetings for each cabinet site; maintain a public web site with information about the upgrade and contact information for public inquiries; place cabinets in alleys or non-sidewalk public rights-of-way where possible;

3

consider options for screening cabinets; attempt to hire San Francisco residents for the project; and reimburse the City for the cost of graffiti removal.

Plaintiffs then brought this action in the trial court, seeking a writ of mandate ordering the City to set aside its approval and refrain from further approvals unless an EIR was prepared and feasible mitigation measures were adopted. The trial court denied the petition.

## II. DISCUSSION

### A. CEQA Overview

"CEQA embodies our state's policy that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1100; § 21001, subd. (d).) To implement this policy, CEQA and the Guidelines issued by the State Resources Agency have established a three-tiered process. (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 (*Davidon Homes*).) In the first step, an agency conducts a preliminary review to determine whether CEQA applies to a proposed activity. (*Ibid.*) If the project is exempt from CEQA, either because it is not a "project" as defined in section 15378 of the Guidelines or because it falls within one of several exemptions to CEQA, "no further environmental review is necessary. The agency may prepare and file a notice of exemption, citing the relevant section of the Guidelines and including a brief 'statement of reasons to support the finding.' (Guidelines, §§ 15061, subd. (d), 15062, subd. (a)([4]).) If, however, the project does not fall within any exemption, the agency must proceed with the second tier and conduct an initial study. (Guidelines, § 15063.) If the initial study reveals that the project will not have a significant environmental effect, the agency must prepare a negative declaration, briefly describing the reasons supporting the determination. (Guidelines, §§ 15063, subd. (b)(2), 15070.) Otherwise, the third step in the process is to prepare a full environmental impact report (EIR) on the proposed project. (Guidelines, §§ 15063, subd. (b)(1), 15080; Pub. Resources Code, §§ 21100, 21151.)" (*Davidon Homes*, *supra*, 54 Cal.App.4th at p. 113.)

4

In addition to establishing certain exemptions by statute (see, e.g., §§ 21080, 21080.01 through 21080.07, 21080.8 through 21080.42), CEQA requires the Guidelines to "include a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from this division. In adopting the guidelines, the Secretary of the Natural Resources Agency shall make a finding that the listed classes of projects referred to in this section do not have a significant effect on the environment." (§ 21084, subd. (a).) In response to that mandate, the Guidelines include a number of classes of projects that the Secretary for Natural Resources found did not have a significant effect on the environment, and that were therefore declared to be categorically exempt from the preparation of environmental documents. (Guidelines, § 15300 et seq.) "Class 3" of these categorical exemptions "consists of construction and location of limited numbers of new, small facilities or structures; installation of small new equipment and facilities in small structures; and the conversion of existing small structures from one use to another where only minor modifications are made in the exterior of the structure. The number of structures described in this section are the maximum allowable on any legal parcel." (Guidelines, § 15303.)

The Guidelines also establish exceptions to the exemptions. (Guidelines, § 15300.2.) "Even if a project falls within the description of one of the exempt classes, it may nonetheless have a significant effect on the environment based on factors such as location, cumulative impact, or unusual circumstances." (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 689 (*Save Our Carmel River*).) Among the exceptions are the following: "(b) Cumulative impact. All exemptions for these classes are inapplicable when the cumulative impacts of successive projects of the same type in the same place, over time is significant. [¶] (c) Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2.)

"In considering a petition for writ of mandate in a CEQA case, '[o]ur task on appeal is "the same as the trial court's." [Citation.] Thus, we conduct our review

5

independent of the trial court's findings.' [Citation.] Accordingly, we examine the City's decision, not the trial court's." (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257 (*Banker's Hill*).)

## B. Does the Project Fit into a Categorical Exemption?

The City concluded that the project fell within the terms of Class 3 of the categorical exemptions. Plaintiffs contend this conclusion was wrong as a matter of law. To the extent this contention "turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents 'a question of law subject to de novo review by this court.' " (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 693.) However, "[w]here the record contains evidence bearing on the question whether the project qualifies for the exemption, such as reports or other information submitted in connection with the project, and the agency makes factual determinations as to whether the project fits within an exemption category, we determine whether the record contains substantial evidence to support the agency's decision." (*Id.* at p. 694.)

As relevant here, Class 3 establishes exemptions for "[1] construction and location of limited numbers of new, small facilities or structures" and "[2] installation of small new equipment and facilities in small structures." (Guidelines, § 15303.) Among the examples of this exemption are "[w]ater main, sewage, electrical, gas, and other utility extensions, including street improvements, of reasonable length to serve such construction." (Guidelines, § 15303, subd. (d).) This exemption has been interpreted to apply "when the project consists of a small construction project and the utility and electrical work necessary to service that project." (*Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096, 1109.)

Plaintiffs contend the project does not fall into clause [1] because 726 new structures are not a "limited number[]," and it does not fall within clause [2] because the project does not involve simply "installation" of equipment in *previously constructed* small structures, but also "construction and location" of the structures in which that

6

equipment will be located. The problem with plaintiffs' argument about clause [2] of the exemption is that the terms of that provision do not limit "installation of small new equipment and facilities" to installation in *existing* small structures. If such a limitation had been intended, it could easily have been included. Indeed, the clause that immediately follows includes that limitation, when it refers to "the conversion of existing small structures from one use to another . . . ." (Guidelines, § 15303.)

Plaintiffs' reliance on *Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950 (*Robinson*) does not persuade us that clause [2] is limited to installing equipment in existing structures. In *Robinson*, this division concluded a project to install wireless telecommunications equipment on existing utility poles fell within the Class 3 exemption. (*Id*. at p. 956.) In doing so, the court stated, "Residents have not identified any authority under which a similar or analogous project—i.e., the installation of small new equipment on numerous existing small structures in scattered locations—was held not categorically exempt under the Class 3 exemptions." (*Ibid*.) The fact that the project in *Robinson* involved existing structures, however, does not meant that *this* project does not fall within the Class 3 exemptions.

We are satisfied that this project proposes the "installation" of the utility cabinets for purposes of clause [2] of the Class 3 exemption. This common-sense interpretation is confirmed by the language of the City's Order No. 175,566, "Regulations for Issuing Excavation Permits for the Installation of Surface-Mounted Facilities in the Public Rights-Of-Way" (the Public Works Order), issued in 2005, which defines "Surface-Mounted Facilit[ies] to mean "any Utility facility (physical element or structure) that [is] *installed, attached, or affixed in the Public Rights-of-Way* on a site that is above the surface of the street . . . ." (Italics added.) "Utility," in turn, includes "telecommunications, high-speed Internet, voice over Internet protocol, video over Internet Protocol . . . or other services that require the provider to install facilities in the Public Rights-of-Way to serve its customers."

Accordingly, we need not consider whether 726 utility cabinets, dispersed throughout the City's 122 million square feet of sidewalks, qualify as a "limited

7

number[]" of small structures for purposes of clause [1] of the Class 3 exemption. (Guidelines, § 15303.)

## C. Does the Project Fall Within an Exception?

Plaintiffs also argue that, even if the project falls within the Class 3 exemption, an EIR is necessary because there is evidence the project will have significant environmental impacts.

"An agency's determination that a project falls within a categorical exemption includes an implied finding that none of the exceptions identified in the Guidelines is applicable. The burden then shifts to the challenging party to produce evidence showing that one of the exceptions applies to take the project out of the exempt category." (*Save Our Carmel River*, *supra*, 141 Cal.App.4th 677, 694.)

One of the exceptions to the categorical exemptions arises "where there is a reasonable possibility the activity will have a significant environmental effect 'due to unusual circumstances.' (Guidelines, § 15300.2, subd. (c).) The Guidelines do not define 'unusual circumstances.' That requirement was presumably adopted to enable agencies to determine which specific activities—within a class of activities that does not normally threaten the environment—should be given further environmental evaluation and hence excepted from the exemption." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1206 (*Azusa*).) "[T]he question whether a particular circumstance exists would normally be a factual issue, whereas the question whether that circumstance is 'unusual' within the meaning of the significant effect exception would normally be an issue of law that this court would review de novo." (*Id*. at p. 1207.)

As explained in *Robinson*, there is a split of authority regarding the standard of proof and the standard of review applicable to an agency's determination of whether a project falls within an exception to the categorical exemptions. "Some courts hold that a party seeking to apply an exception must ' "produce *substantial evidence showing a reasonable possibility* of adverse environmental impact sufficient to remove the project from the categorically exempt class. [Citations.]" [Citations.]' [Citation.] Under this

8

approach, 'a court will uphold an agency's decision if there is *any* substantial evidence in the record that there will be *no* significant effect on the environment.' [Citations.] [¶] Other courts hold that the government agency tasked with CEQA review of a project 'must apply a *fair argument approach* in determining whether, under Guidelines section 15300.2[, subdivision ](c), there is no reasonable possibility of a significant effect on the environment' so as to bring the project within the scope of an exception. [Citations.] Courts that apply this standard 'independently review the agency's determination under Guidelines section 15300.2[, subdivision ](c) to determine whether the record contains evidence of a fair argument of a significant effect on the environment.' " (*Robinson*, *supra*, 208 Cal.App.4th at p. 957.)[5]

We need not resolve this issue, because, as set forth below, we would reach the same result whether we reviewed the record for substantial evidence to support the City's determination or for evidence to support a fair argument of a significant impact.

"The application of Guidelines section 15300.2[, subdivision ](c) involves two distinct inquiries. First, we inquire whether the Project presents unusual circumstances. Second, we inquire whether there is a reasonable possibility of a significant effect on the environment *due to* the unusual circumstances." (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 278; see also *Voices for Rural Living v. El Dorado Irrigation Dist.*, *supra*, 209 Cal.App.4th at pp. 1107–1108.) The court in *Azusa* explained that the "unusual circumstances" test "is satisfied where the circumstances of a particular project (i) differ from the general circumstances of the projects covered by a particular categorical

---

[5] In *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1350 (*Wollmer*), this division stated that in reviewing the question of whether a challenger has shown that one of the Guidelines section 15300.2 exceptions applies, "[o]ur job is to ask if the record reveals substantial evidence of a fair argument that there could be a significant effect on the environment." In *Robinson*, this division noted the split of authority on the proper standard, but concluded that on the facts of that case, the result would be the same under either standard. (*Robinson*, *supra*, 208 Cal.App.4th at pp. 957–958.) The question of the correct standard is raised in a case currently pending before our Supreme Court. (*Berkeley Hillside Preservation v. City of Berkeley*, S201116, rev. granted May 23, 2012.)

9

exemption, and (ii) those circumstances create an environmental risk that does not exist for the general class of exempt projects." (*Azusa*, *supra*, 52 Cal.App.4th at p. 1207; see also *Wollmer*, *supra*, 193 Cal.App.4th at p. 1350.)[6]  "[W]hether a circumstance is '*unusual*' is judged relative to the *typical* circumstances related to an otherwise typically exempt project." (*Santa Monica*, *supra*, 101 Cal.App.4th at p. 801.)

The court in *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 129 (*CBE*), framed the test somewhat differently, stating, "An important exception to categorical exemptions, based on [*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205–206], provides that a 'categorical exemption shall not be used for a[] [particular] activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.'[] These other environmental effects that CBE mentions would constitute 'unusual circumstances' under this exception for a project that otherwise meets the Guidelines section 15332 [in-fill development project exemption] criteria.  This is because a project that does meet the comprehensive environmentally protective criteria of section 15332 normally would not have other significant environmental effects; if there was a reasonable possibility that the project would have such effects, those effects would be 'unusual circumstances' covered by the [Guidelines] section 15300.2, subdivision (c) exception.  In this way, these other effects would fall within the concept of unusual circumstances set forth in *Azusa*."

Plaintiffs have not identified any way in which the utility boxes would create impacts that would "differ from the general circumstances of the projects covered by" the Class 3 exemption, or, for that matter, in which any circumstances "create an environmental risk that does not exist for the general class of exempt projects." (*CBE*, *supra*, 103 Cal.App.4th at p. 129.)  The record indicates that the City has, at a minimum,

---

[6] Citing *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 800 (*Santa Monica*), the court in *Banker's Hill* added, " 'A negative answer to either question means the exception does not apply.' " (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 278.)

tens of thousands of street-mounted facilities; these include 1,100 bus shelters, 13,000 MUNI-maintained poles, 132 cabinets to support MUNI operations, 33 advertising kiosks, 5,800 signalized intersections, 25 automatic toilets, 113 kiosks, 744 news racks, 5,151 trolley poles, 21,891 street lights, and five street light controllers, for a total of 47,994 such facilities.  This number, however, does not include mail boxes, PG&E surface facilities, water department surface facilities, fire hydrants, or street trees.  There is no basis to conclude the addition of 726 additional utility cabinets would be "unusual" in the context of the City's urban environment, which is already replete with facilities mounted on the public rights-of-way.

Plaintiffs contend, however, that there is a fair argument the project has the potential for significant impacts on aesthetics and pedestrian safety, and that the potential for these impacts *itself* constitutes an unusual circumstance calling for the preparation of an EIR.  *Berkeley Hillside Preservation v. City of Berkeley* (S201116, rev. granted May 23, 2012), currently pending before our high court, raises the question of whether the "significant effect" exception of Guidelines section 15300.2, subdivision (c), is limited to circumstances in which there are "unusual circumstances" that are independent of a project's potential to have a significant environmental effect; that is, whether the unusual circumstances exception applies *whenever* there is a reasonable possibility of a significant effect on the environment.  Whatever the outcome of that case, however, we are not persuaded that there is a fair argument of significant impacts here.

The evidence that plaintiffs contend supports a fair argument of significant impacts is found primarily in statements of a number of residents of San Francisco, as well as members of the Board of Supervisors, to the effect that the utility boxes would be unsightly, they would attract graffiti and public urination, they would impede pedestrians, and they would block driver's views.  In particular, plaintiffs point to testimony and communications from San Francisco residents stating that the current boxes were "graffiti magnets," that people urinated on them, that garbage collected around them, that residents or the City had to remove graffiti from the existing boxes because AT&T failed to do so, that although AT&T had promised to use graffiti-resistant coverings, the boxes

11

were still marked with graffiti, and that the new boxes would attract more of such behavior, could serve as part of homeless encampments, and would block visibility for pedestrians and drivers using their driveways.

Plaintiffs also draw our attention to statements made by a planning commissioner and members of the City's Board of Supervisors. Ron Miguel, the Vice President of the Planning Commission, stated in an April 2011 letter that the project "reverses the impressive work which has been done in the past year to develop standards for our public streets. The Planning Department and the Board of Supervisors are in accord with the Better Streets legislation—and work in many areas of our city is already reflective of the advantages which follow from proper consideration to areas of public access, ADA requirements, and overall beautification. It enhances not only property values, but quality of life for both San Franciscans and visitors. The installation of 726 large intrusions on the public right-of-way by a private company is completely inconsistent with the direction the Board of Supervisors has given to Planning and DPW." Supervisor Chu stated in a July 2008 hearing that she had called "311" to report graffiti, paper cups, and litter around boxes, and that in the "stark environment" of the Sunset district, additional boxes would have a significant effect on the beauty of the community. At the same hearing, Supervisor McGoldrick urged the Board to examine the aesthetic and cumulative impacts of the utility boxes. Moreover, as plaintiffs point out, the Board of Supervisors approved the project by only a six-to-five vote.

Public controversy in itself does not require an EIR to be prepared "when there is no substantial evidence in the record that the project as designed and approved will fall within the requirements of [CEQA]." (*Running Fence Corp. v. Superior Court* (1975) 51 Cal.App.3d 400, 424; see also *Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424, 435–436 [difference of opinion between planning commission and board of supervisors does not establish serious public controversy]; § 21082.2, subd. (b).)

"The significance of an environmental impact is . . . measured in light of the context where it occurs. The Guidelines confirm that 'the significance of an activity may vary with the setting. For example, an activity which may not be significant in any urban

12

area may be significant in a rural area.' [Citations.] To conclude that replacement of a virgin hillside with a housing project constitutes a significant visual impact says little about the environmental significance of the appearance of a building in an area that is already highly developed." (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 589 (*Bowman*); see also *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 243–244 [upholding EIR's conclusion that visual impact of new homes was not significant because area was already residential]; compare *Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1337–1338 [EIR necessary where project would "create[] a change in the aesthetic environment and interfere[] with scenic views of the public in general by introducing into the primarily single-family, residential neighborhood a large, high-density, residential building . . ."].) As to the sort of aesthetic impacts asserted here, the Guidelines show that the relevant inquiry is whether a project would "[s]ubstantially degrade the *existing* visual character or quality of the site or its surroundings." (Guidelines, appendix G, italics added.)

Bearing these standards in mind, we conclude plaintiffs did not "produce evidence showing that [the significant impact exception] applie[d] to take the project out of the exempt category." (*Save Our Carmel River*, *supra*, 141 Cal.App.4th 677, 694.) The City is an urban environment. Its rights-of-way already contain, at a minimum, tens of thousands of structures. In its exemption from environmental review, the Planning Department stated: "The project sponsor proposes to deploy up to 726 Lightspeed cabinets in a dispersed manner within public right-of-way. The profile of these cabinets would be visible to passersby and observers from nearby buildings, but may not be noticed by the casual observer. The visual impacts of the cabinets would be confined to the immediate area in which the cabinets are located. Utility-related facilities in the public right-of-way are common throughout the City's urbanized environment (e.g., traffic control cabinets and other utility cabinets). AT&T's cabinet installations would generally be viewed in the context of the existing urban background, and the incremental visual effect of the proposed cabinets would be minimal."

13

The Planning Department went on: "Pursuant to the submitted project proposal, the proposed cabinets would be located in a manner that would not obstruct pedestrian access, would not intrude on pedestrian 'clear zones' at street corners, and would not obstruct the view of any traffic sign, way-finding sign or traffic signal.[] AT&T's cabinet placement considerations include setback distances from corners, fire hydrants, transit shelters, kiosks, certified street artist designated areas, and public art work under the jurisdiction of the Arts Commission, except for art on kiosks. If necessary, AT&T would conduct site visits with neighborhood groups to consider location options. Landscaping and screening are also available options for consideration in placing new cabinets. The proposed Lightspeed cabinets would have a graffiti resistant finish and would display a sticker with a toll-free number so that AT&T could proactively remove graffiti. If required for safety, bollards would also be installed."

Thus, under the project, the additional 726 cabinets will be placed in an urban environment that already contains large numbers of structures on the sidewalks, and they will not be permitted to obstruct pedestrian access, "clear zones" at street corners, or traffic signs. We recognize the concern that the new cabinets will become targets for graffiti or public urination. However, given the presence of numerous other structures on the rights-of-way, there is no basis to conclude people are more likely to engage in those anti-social behaviors in the presence of the cabinets than in their absence—that is, that the cabinets will bring about an increase in this behavior in a way that would rise to a significant impact. On the facts of this case, there is no fair argument they will create a significant environmental impact.

Against this conclusion, plaintiffs rely on cases in which residents or public officials presented fact-based evidence to support a fair argument that a project would have significant environmental effects. In *Architectural Heritage Assn. v. County of Monterey, supra,* 122 Cal.App.4th 1095, a county planned to demolish an old jail building, and prepared a mitigated negative declaration. (*Id*. at pp. 1099–1100, 1106.) The record included a recommendation of the county's Historic Resources Review Board taking the position that the jail was a historic resource, based on a subcommittee's

14

investigation indicating that the jail's structure was " 'a rare type,' " and that historically significant people, including Cesar Chavez, were associated with the jail. (*Id*. at p. 1115.) In addition, members of the public, including an architect and a certified historian serving on the jail subcommittee, commented on the jail's association with notable historic figures and its architectural significance. (*Id*. at pp. 1116–1117.) This, the court concluded, constituted fact-based evidence to support a fair argument that the demolition would have a significant impact to a historic resource. (*Id*. at pp. 1108, 1115–1118.) Similarly, in *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, a county's planning department, air pollution control district, and one planning commission member had recognized the probable growth-inducing effect of a golf course project; the planning department noted that experience showed that often such a project acted as a catalyst triggering requests for residential development, and relied for its conclusions on consideration of similar projects elsewhere. (*Id*. at pp. 153, 155.) The court concluded that the county had improperly adopted a negative declaration for the project rather than preparing an EIR. (*Id*. at p. 160.)

These cases are inapposite to the matter before us. Here, the Planning Commission concluded the utility cabinets would be dispersed, that their impacts would be confined to their immediate vicinity and might not be noticed by causal observers, that such facilities are common in the City's urbanized environment, that they would not block pedestrian access or obstruct drivers' views, and that the cabinets would have a graffiti-resistant finish and a sticker with a toll-free number so AT&T could remove graffiti. In this context, the concerns raised by certain officials and members of the public do not rise to the level of substantial evidence of a significant impact on aesthetics or pedestrian safety.

The cases in which residents' views on a project's aesthetic effects were held to be substantial evidence of a significant impact do not lead us to any other conclusion. In *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903 (*Pocket Protectors*), the court concluded that a public entity's approval of a mitigated negative declaration was inappropriate where another official body and members of the public had

15

presented evidence that a project would violate zoning regulations and would have an adverse aesthetic effect. The project was a development of detached single family homes on a strip of undeveloped land that was zoned "R-1A" (single-family alternative zone) as part of a Planned Unit Development (PUD). (*Id*. at pp. 908–909, 911.) The PUD included a variety of housing types, including, " 'Townhouse (or similar development),' zoned R-1A." (*Id*. at pp. 908–909.) The Planning Commission had rejected an earlier version of the project because it did not comply with the PUD, and City planning staff admitted the project would violate the PUD's objectives. (*Id*. at pp. 931–932.) Based on this evidence, the Court of Appeal concluded there was substantial evidence that the project conflicted with the objectives of the PUD. (*Id*. at p. 931.) As to aesthetic impacts, the court noted that "the opinions of residents, if based on direct observation, may be relevant as to aesthetic impact and may constitute substantial evidence in support of a fair argument; no special expertise is required." (*Id*. at p. 937.) Such evidence was found in testimony by residents of the area and an architect that the project would create a " 'tunnel or canyoning effect of wide houses on small lots,' " that it would be difficult to install adequate landscaping, and that some of the houses would open their front doors onto a greenbelt. (*Id*. at pp. 920, 937.)

Aesthetic concerns were also at issue in *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 (*Ocean View*). The Court of Appeal there concluded a water district was required to consider aesthetic impacts in an EIR before approving a project to cover a four-acre reservoir with a semi-reflective aluminum roof. (*Id*. at pp. 398, 401.) The roof would be visible from public trails, and the county had urged the water district to develop appropriate mitigation if the roof could be seen from the trails. (*Id*. at pp. 401–402.) The court concluded that this evidence, along with residents' observations about the aesthetic effects of the alteration of the view—from one with a " 'striking and unique visual feature' " of " 'clear blue water in a densely vegetated area' "—could constitute substantial evidence to support a fair argument that the aluminum roof might have a significant adverse aesthetic impact. (*Id*. at pp. 401–403.)

16

*Pocket Protectors* and *Ocean View* are both characterized by a clear change to the existing environment. In *Pocket Protectors*, the residential project was to be built on undeveloped land, in a manner inconsistent with zoning. The aluminum roof proposed to cover a four-acre reservoir in *Ocean View* would alter the views from public trails. These cases do not consider the sort of impact present here—the addition of new small structures to urban streets in which such structures are already a ubiquitous feature of the environment. Neither the concerns expressed by residents nor those raised by members of the Planning Commission or the Board of Supervisors rise to the level of fact-based evidence that the utility cabinets will substantially degrade the existing visual character of the urban environment in which they will be placed.

This division reached a similar conclusion in *Bowman*, stating, "[W]e do not believe that our Legislature in enacting CEQA . . . intended to require an EIR where the sole environmental impact is the aesthetic impact of a building in a highly developed area. [Citations.] To rule otherwise would mean that an EIR would be required for every urban building project that is not exempt under CEQA if enough people could be marshaled to complain about how it will look. While there may be situations where it is unclear whether an aesthetic impact like the one alleged here arises in a 'particularly sensitive' context (Guidelines, § 15300.2) where it could be considered environmentally significant, this case does not test that boundary. The aesthetic difference between a four-story and a three-story building on a commercial lot on a major thoroughfare in a developed urban area is not a significant environmental impact, even under the fair argument standard." (*Bowman supra*, 122 Cal.App.4th at p. 592.)

Plaintiffs also argue that the project will cause cumulative impacts that take it out of the Class 3 exemption. Guidelines section 15300.2, subdivision (b) provides: "All exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant." As explained in *Robinson*, an argument that an agency must consider the cumulative impact of all similar equipment that had been or would be installed throughout the City "ignores the language in the Guidelines limiting the cumulative impact exception to 'successive projects of the

17

same type *in the same place . . . .*' (Guidelines, § 15300.2, subd. (b), italics added.) This limitation makes sense, because without a limitation as to the location of the projects whose cumulative impact must be considered, agencies deciding whether the exception applies to a project would be required, in every instance, to consider the cumulative environmental impact of all successive similar projects in their jurisdictions, at least, and perhaps regionally or even statewide. If this were the case, the exception would swallow the rule, and the utility of the Class 3 exemption would be vitiated." (*Robinson*, *supra*, 208 Cal.App.4th at p. 958.)

Plaintiffs have not drawn our attention to any evidence showing that the utility boxes will create significant cumulative impacts in the individual locations in which they are placed. They point to comments made in opposition to the 2008 version of the project, in which an opponent stated that at some of the locations AT&T had identified there would be two new boxes. This is not evidence that AT&T is currently planning to locate more than one box in close proximity, nor that the cumulative impacts of such a placement would be significant. Plaintiffs did not meet their burden to show the cumulative effects exception applied.

Nor are we persuaded by plaintiffs' argument that the project's impacts are shown by purported inconsistencies with the Public Works Order and the City's Better Streets Plan, adopted in 2010. The Public Works Order recites that the Department of Public Works was "concerned that the installation of surface-mounted facilities in the public rights-of-way will impede travel on public streets, inconvenience property owners, create visual blight, or otherwise incommode the use of the public rights-of-way by the public." Therefore, the Public Works Order explained, "it is the Department's policy to require that such surface-mounted facilities be installed on private property or be placed underground to the extent either of these options is technologically or economically feasible. At the very least, the Department has required that applicants minimize the impact that the placement of any surface-mounted facilities will have on use of the public rights-of-way." Under the Public Works Order, before applicants are permitted to install surface-mounted facilities in public rights-of-way, they must show they have tried to

18

place the facilities on private property or underground.  The Public Works Order also provides that in selecting appropriate locations for surface-mounted facilities in rights-of-way, the applicant must minimize the impacts of the placement in a variety of ways; among them, the applicant must place the facilities in a manner that does not unreasonably impede pedestrians, particularly people with disabilities; provide four feet of pedestrian clearance; not intrude on pedestrian " 'clear zones' " at street corners; provide specified setbacks from crosswalks, curbs, fire hydrants, driveways, transit shelters, curb ramps, blue zone parking spaces, street lights, parking meters, and trees; place the facilities so they do not obstruct the view of any traffic sign or traffic signal; place them on streets with minimal pedestrian travel; limit the height and footprint of the facilities; either use stainless steel or paint the facilities in the colors used by City structures in the vicinity; include a graffiti-proof coating; and screen the facilities by landscaping or camouflaging.  The order also provides for notice to the public of proposed sites, for a hearing before the Public Works Department if there are non-frivolous objections, and for an appeal of the department's approval or denial of a permit to install a surface-mounted facility.

The Better Streets Plan likewise acknowledges that surface-mounted facilities will be installed on City rights-of way, stating:  "Surface-mounted utilities are often bulky and unattractive elements in the streetscape.  Where possible, they should be located outside of the right-of-way and screened within private parcels.  However, in many cases, they will be located in the public right-of-way.  To that end, they should minimize their negative visual impact."  The plan notes that surface-mounted utilities must comply with the Public Works Order, and provides that they should be screened by being painted either in a neutral color or with public art, and should, where possible, be buffered by sidewalk planters, walls, artistic screens, or other elements.

Thus, both the Public Works Order and the Better Streets Plan envision that utility boxes will be installed on the public rights-of-way, and require applicants to locate and design the structures in a way that minimizes effects on pedestrian and driver safety and on aesthetics.  There is no basis to conclude the project will not comply with these

19

requirements, and plaintiffs have not persuaded us that the project is inconsistent with these enactments.

## D. Does the Categorical Exemption Rely on Mitigation Measures?

Finally, plaintiffs contend the City improperly relied on mitigation measures in concluding the project was categorically exempt from CEQA. As explained by this division in *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1102, "Only those projects having no significant effect on the environment are categorically exempt from CEQA review. [Citation.] If a project may have a significant effect on the environment, CEQA review must occur and only then are mitigation measures relevant. [Citation.] Mitigation measures may support a negative declaration but not a categorical exemption."

Plaintiffs contend the Notice of Exemption shows the project approval was improperly based on mitigation measures requiring the City to review the utility cabinets to evaluate their potential to impede travel, inconvenience property owners, or otherwise disturb use of the right-of-way. The notice of exemption stated in pertinent part: "The proposed project is subject to the requirements for excavations permits in Article 2.4 of the Public Works Code and the requirements of Department of Public Works (DPW) Order No. 175,566 concerning placement of surface-mounted facilities (SMF) in the public right-of-way.[] DPW reviews each application on an individual basis and evaluates the potential for the proposed facilities to impede travel on public streets, inconvenience property owners, or otherwise disturb the use of the public right-of-way by the public." We disagree with plaintiffs' argument that this review constitutes a mitigation measure. Rather, the review is required by the Public Works Order, which is generally applicable to excavation permits for surface-mounted facilities. An agency may rely on generally applicable regulations to conclude an environmental impact will not be significant and therefore does not require mitigation. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 932–934; *Association for Protection Etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 734–736 [categorical exemption].)

20

Plaintiffs also contend the project's environmental effects were improperly mitigated by the July 19, 2011 MOU, in which AT&T agreed to provide additional public notice for each cabinet site, maintain a public web site, consider non-sidewalk locations for cabinets, consider various screening options consistent with the Public Works Order and the Better Streets Plan, provide information about the feasibility of "undergrounding" its equipment, try to hire a local workforce, and pay the cost of permit processing, graffiti removal, and any necessary cabinet relocation. Although members of the Board of Supervisors expressed approval of AT&T's agreement to increase public outreach, the record does not show that agreement was the basis for the Board's conclusion that the project qualified for a categorical exemption from CEQA review, or that it constituted a mitigation measure for a significant effect on the environment.

### III. DISPOSITION

The judgment is affirmed.


_____
Rivera, J.


We concur:


_____
Ruvolo, P.J.


_____
Humes, J.

21

Filed 5/30/14

**CALIFORNIA COURT OF APPEAL**
**FIRST APPELLATE DISTRICT**
**DIVISION FOUR**


SAN FRANCISCO BEAUTIFUL et al.
v.
CITY AND COUNTY OF SAN FRANCISCO et al.
AT&T CALIFORNIA

A136546
San Francisco County
Sup. Ct. No. CPF11511535

BY THE COURT:

The petition for rehearing filed by appellants is denied.

The requests for publication of this court's April 30, 2014 opinion are granted.

The Reporter of Decisions is directed to publish said opinion in the Official Reports.

(Ruvolo, P. J., Rivera, J., and Humes, J. joined in the decisions.)


Date:_____5/30/14_____    _____Ruvolo_____P. J.

San Francisco Beautiful et al. v. City and County of San Francisco  (A136546)

Trial court:          San Francisco City and County

Trial judge:          Hon. Teri L. Jackson

Attorneys:

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiff and Appellant

Dennis J. Herrera, City Attorney, Kristen A. Jensen, Deputy City Attorney, John Malamut, Deputy City Attorney, William K. Sanders, Deputy City Attorney, and Victoria Wong, Deputy City Attorney, for Defendant and Respondent

Mayer Brown LLP Michael J. Gill, Donald M. Falk, and Edward D. Johnson for Real Party in Interest and Respondent

Holland & Knight LLP, Amanda Monchamp and Melanie Sengupta for Real Party in Interest and Respondent