Filed 7/16/18; Certified for Publication 8/9/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PROTECT NILES et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF FREMONT et al.,<br><br>     Defendants and Respondents;<br><br>DOUG RICH et al.,<br><br>     Real Parties in Interest and<br>     Appellants. | A151645<br><br>(Alameda County<br>Super. Ct. No. RG15765052) |

The City of Fremont (City) approved a residential and retail development (Project) in its Niles historical district over considerable neighborhood opposition. The City adopted a mitigated negative declaration after finding the Project as mitigated would have no significant adverse environmental impact. Protect Niles[1] petitioned for a writ of mandamus ordering the City to overturn the project approvals and prepare an environmental impact report. The trial court granted the petition after finding substantial evidence supported a fair argument of significant adverse impacts on aesthetics (incompatibility with the historical district) and traffic. We affirm.

---

[1] Protect Niles is an unincorporated association formed after the Project's approval to "protect the Niles [historical district] neighborhood and ensure the City's compliance with [the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)]."

1

We conclude the Project's compatibility with the historical district is properly analyzed as aesthetic impacts, and we find substantial evidence in this record supports a fair argument of a significant aesthetic impact of the Project on the Niles historical district. We also conclude the record contains substantial evidence supporting a fair argument of significant traffic impacts, notwithstanding a professional traffic study concluding the anticipated adverse impacts fell below the City's predetermined thresholds of significance.

## I. BACKGROUND

### Niles Historical Overlay District

The City has designated certain areas of Niles as the Niles Historic Overlay District (Niles HOD),[2] and adopted design guidelines and regulations for commercial properties in the core area of the district (HOD Guidelines; Fremont Mun. Code, § 18.135.010 et seq.). The district has a distinctive character with large unusual trees lining the streets, and its seven-block-long commercial main street and surrounding neighborhood feature historic buildings with diverse architectural styles and details. According to a planning staff report on the Project before us, the HOD Guidelines also offer "general guidance . . . for maintaining compatibility with the unique characteristics" of the HOD for areas outside the commercial core. The HOD Guidelines' "vision" for the Niles HOD is in part to preserve the district's "small town character." The City's Historical Architectural Review Board (HARB) is charged with reviewing exterior features of proposed developments in the Niles HOD and advising the planning commission and city council regarding project approvals. (Fremont Mun. Code, § 18.135.050.)

The Project site lies entirely within the Niles HOD and abuts the Niles commercial core. Niles's main street, Niles Boulevard, borders the Project site at an acknowledged

---

[2] Niles hosted silent movie production in the 1910's and is home to historic mills, orchards, and nurseries from the mid-19th century, as well as an 1869 station on the first transcontinental railroad. Today, restored steam engines take visitors on excursions through Niles Canyon to the northeast, and the town hosts several events and fairs.

2

"gateway" to the Niles HOD and westbound motorists on Niles Boulevard encounter a large "NILES" sign as they pass under a railroad trestle just before the Project site. The site was used for foundry, manufacturing, and machining purposes in the early 1900's, cannery activities from the 1920's to the 1940's, and varied chemical manufacturing thereafter. After a 2008 fire destroyed a historic office building, HARB took steps to allow demolition of buildings remaining on the site, and environmental remediation has made the site suitable for residential construction.

*Project Description*

In June 2014, developers Doug Rich and Valley Oak Partners (collectively Valley Oak) submitted a planning application for the Project. The six-acre Project site was vacant except for building foundations, piles of debris, and some trees. The irregular shaped site is bordered on the south by Alameda Creek and the Alameda Creek Trail; on the west by a neighborhood of single family homes; on a northwest diagonal by the Niles HOD commercial core; and on the north and east by Niles Boulevard.

Valley Oak proposed building 85 residential townhomes in the southern portion of the site and mixed residential and retail in the northern portion. The density of the townhouse area would be 15.6 units per acre (85 homes on 5.43 acres), with a maximum height of 35 feet (three stories). A new street (New Street) in the Project would be built to connect with Niles Boulevard. Valley Oak's "vision for this site is the establishment of an iconic development that enhances the historic character of Niles' town center, the sense of arrival to the Alameda Creek Trail, and most importantly, the reinforcement of the vitality and eclectic nature of the Niles community."

*Environmental Review*

Following an initial study, City planning staff prepared a draft mitigated negative declaration (MND) in lieu of a full environmental impact report (EIR). The draft MND found the Project would have no impact or a less than significant impact (with or without mitigation) in all environmental areas studied, including as relevant to this appeal "Aesthetics, Light and Glare" and "Transportation/Traffic." On the aesthetic issue, the City found the Project would not "[s]ubstantially degrade the existing visual character or

3

quality of the site and its surroundings" because it "would be visually compatible with surrounding development and consistent with the vision for Niles, as outlined in the [HOD Guidelines] . . . . The proposed buildings and landscapes reinforce the gateways and the strong sense of place found in Niles." Moreover, the visual appearance of the site would improve from its existing "dilapidated, unsightly visual appearance." On the traffic issue, the City relied on an expert traffic study and found the Project would not have significantly adverse traffic impacts with the addition of a single mitigation measure requiring Valley Oak to ensure adequate sight distance at the intersection of the proposed New Street and Niles Boulevard intersection (New Street/Niles intersection).

The draft MND was referred to HARB for advisory review. Specifically, HARB was asked to review the historical resources section of the draft MND and review the Project overall for compatibility with the HOD Design Guidelines. In a report to HARB, City staff recommended that HARB find the Project compatible because it reflected the architectural styles of former industrial buildings on the site and reduced heights of buildings on the Project's periphery preserved views and softened the interface with adjacent areas. At a January 2015 HARB hearing, several Niles residents argued the Project was not consistent with the HOD: they objected to the height of some three-story buildings (particularly on the Project site periphery), which might block hill views; the density in the townhouse area; the architectural style of the buildings; and the choice of colors and materials on building exteriors. They also objected to the Project's density as a generator of traffic and parking problems in and around the Niles HOD. Most HARB members echoed these sentiments, while a distinct minority of speakers and HARB members spoke in favor of the Project and its consistency with the HOD Guidelines. HARB voted four to one to recommend denial of the Project because it "would be incompatible in terms of siting, massing, scale, size, materials, textures, and colors with existing development in the Niles [HOD]."

The Project and draft MND were next referred to the planning commission for approval. A staff report again recommended Project approval and adoption of the draft MND. At the February 2015 hearing, Valley Oak defended the Project design in terms

4

similar to the staff report and reported plans to change some exterior and roof designs in response to HARB's concerns. When pressed on the density issue, Valley Oak said the Project would not be economically feasible if the density were significantly reduced. Public comments submitted in writing and those presented orally at the hearing reflected the same concerns expressed during the HARB hearing.[3] The commissioners voted six to zero (with one member recused) to recommend that the city council approve the Project and adopt the draft MND subject to conditions including height reduction of some townhouses; ensuring high windows did not provide views into adjacent homes; reduced use of metal siding; and improved traffic flow at the New Street/Niles intersection with a turnaround.

At a March 3, 2015 city council meeting, residents continued to object to the Project despite some modifications. Some councilmembers echoed these concerns. The New Street/Niles intersection was discussed extensively, specifically regarding the need for a left-turn pocket lane to ensure safety and traffic flow. However, the council voted three to two to approve the Project and adopt the draft MND.[4] The City issued a "Notice of Determination," finding the Project as mitigated would not have a significant effect on the environment. It separately found the Project was "functionally and aesthetically compatible with the building styles, materials, colors and significant features . . . with the Niles HOD." One of the City's "conditions of approval" dealt with traffic issues: "The applicant shall work with the Public Works Department to include a north[/west]bound left-turn pocket lane on Niles Boulevard at the new intersection of Street A and Niles Boulevard if the Public Works Department determines the adequate right-of-way will accommodate a left-turn pocket lane."

---

[3] Residents presented commissioners with a petition purportedly signed by 175 citizens asking them to consider the Project's impacts before allowing "this high-density project" to move forward. Commissioners were later presented with a petition in favor of the Project signed by eight Niles business owners.

[4] The council again voted three to two to approve the Project and adopt the draft MND after a second reading on March 17, 2015.

The only relevant CEQA mitigation measure required a specified sight distance at the New Street/Niles intersection. As approved, the Project still included 98 residential units.

*Trial Court Proceedings*

On April 3, 2015, Protect Niles and Niles resident Julie A. Cain (collectively, Protect Niles) petitioned for a writ of mandamus ordering the City to set aside the Project approvals and prepare an EIR. Protect Niles argued substantial evidence supported a fair argument of significant aesthetic/land use impacts (consistency with the Niles HOD), traffic impacts, hazardous materials impacts, and impacts on the Alameda Creek Regional Trail.

The trial court found substantial evidence supported a fair argument of significant impacts on aesthetics and traffic only. On aesthetics, the court cited "the testimony and views of members of the public and the opinions of the HARB members who were clear in their view that the project is incompatible with the Niles esthetic. . . . [¶] [T]he opinions of the HARB members, charged with the duty to evaluate esthetics, must be considered in the same category as 'expert' testimony." On traffic, the court cited "a plethora of commentary by members of the public . . . [describing] an already low level of service and asserting that the reduction in the level of service will be more significant than is reflected in the Initial Study/MND. [¶] . . . [¶] Respondents are incorrect that the Initial Study/MND data does not demonstrate a traffic impact. Respondents are also incorrect that a change in level of service from 'E' level to 'F' level is not substantial evidence of a significant traffic impact, and that conclusion is particularly true in combination with the relevant personal reservations from the community members who describe the actual impacts of the Initial Study/MND's statistics on the level of service. [¶] [T]he City is [also] incorrect that [an adopted threshold of significance] trumps a fair argument that a project may cause a significant impact. (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 111–114.) [¶] The record also reflects commentary regarding the safety, or lack thereof, of the proposed left turn for vehicles traveling northward on Niles Boulevard at the street

6

proposed to be built as the primary entrance to the project. That commentary was validated by the city councilman, who has traffic engineer expertise . . . ." The court ordered the City to vacate its Project approvals and refrain from approving the Project "absent compliance with CEQA in the preparation of an EIR." Valley Oak appeals.

## II. DISCUSSION

### A. *CEQA Legal Standards*

" 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." [Citation.] . . . [¶] [The Supreme Court has] repeatedly recognized that the EIR is the "heart of CEQA." ([Citations]; see also [Cal. Code Regs., tit. 14], § 15003, subd. (a)[5].) "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' [Citation.]" [Citation.] To this end, public participation is an "essential part of the CEQA process." ([CEQA] Guidelines, § 15201; [citation].)

" 'With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project "may have a significant effect on the environment." ([Pub. Resources Code,] §§ 21100, 21151, 21080, 21082.2 [fair argument standard]; [CEQA] Guidelines, §§ 15002, subd. (f)(1), (2), 15063; [citation].) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." ([Pub. Resources Code,] § 21068; see also [CEQA] Guidelines, § 15382.)' [Citation.]

"If there is substantial evidence in the whole record supporting a fair argument that a project may have a significant nonmitigable effect on the environment, the lead agency shall prepare an EIR, even though it may also be presented with other substantial evidence that the project will not have a significant effect. ([Pub. Resources Code,]

---

[5] Regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq. and are called the " 'State CEQA Guidelines.' " (Cal. Code Regs., tit. 14, § 15001.) These regulations are hereafter referred to as CEQA Guidelines.

7

§ 21151, subd. (a); [CEQA Guidelines], § 15064, subd. (f)(1), (2); [citations].) 'May' means a reasonable possibility. ([Pub. Resources Code,] §§ 21082.2, subd. (a), 21100, 21151, subd. (a); [citation].)

" 'Substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' ([CEQA] Guidelines, § 15384, subd. (a).) Substantial evidence 'shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' ([*Id.*], § 15384, subd. (b).) 'Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence.' ([*Id.*], § 15384, subd. (a).)

"The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*. [Citations.] [¶] [H]owever, we must ' "giv[e] [the lead agency] the benefit of [the] doubt on any legitimate, disputed issues of credibility." ' [Citation.] . . . [¶] Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence for a fair argument. [Citations.] . . . [¶] On the other hand, mere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument. ([Pub. Resources Code,] § 21082.2, subd. (c); [CEQA] Guidelines, § 15384, subd. (a); [citations].) 'The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment.' ([Pub. Resources Code,] § 21082.2, subd. (b); [citation].) Neither is the mere possibility of adverse impact on a few people, as opposed to the environment in general." (*Pocket*

8

*Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 926–929, fns. omitted (*Pocket Protectors*).)

B.      *Motion to Dismiss*

On May 29, 2018, Protect Niles moved to dismiss this appeal on the ground it became moot with the City's May 25 publication of a draft EIR on a revised Project application by Valley Oak. Protect Niles argues Valley Oak voluntarily complied with the trial court judgment and the appeal accordingly seeks nothing more than an "advisory opinion that the [C]ity's approval of the [Project] did not require preparation of an EIR." We disagree. The *City* has voluntarily complied with the trial court's directive to prepare an EIR, but the City is not an appellant in this case. The appellant, Valley Oak, was not commanded to take any particular action by the trial court and thus cannot have voluntarily complied with the trial court's order. Valley Oak's alleged submission of a revised Project application is not tantamount to withdrawal of its original Project application or abandonment of its legal position in this appeal that the original application was properly approved by the City without preparation of an EIR. Dismissal of an appeal is discretionary (Cal. Rules of Court, rule 8.244(c)(2); *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 300, fn. 4.) We decline to do so at this late date. Moreover, the appeal is not truly "moot." Were Valley Oak to prevail in this appeal, the City's 2015 Project approval would be restored regardless of the status of the revised application and EIR.[6]

---

[6] We deny Protect Niles's May 29, 2018 request for judicial notice because, even assuming the attached materials are subject to judicial notice, they do not demonstrate the case has become moot. Accordingly, we also deny Valley Oak's June 13, 2018 request for judicial notice that was submitted in opposition to Protect Niles's motion to dismiss. (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [judicial notice taken only of relevant material], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

C.    *Aesthetic Impacts*

    1.    *Alleged Forfeiture of Land Use Guidelines Argument*

As a preliminary matter, we address Valley Oak's contention that Protect Niles forfeited its argument that the Project is incompatible with HOD Guidelines because it did not appeal the trial court's rejection of an argument regarding violation of land use policies. In the trial court, Protect Niles argued evidence of the Project's incompatibility with the Niles HOD supported a fair argument of significant impacts on both aesthetics and local land use policies—specifically, conflict with the HOD Guidelines. The City and Valley Oak responded to both theories. In its written order on the merits, the trial court accepted the aesthetic impact theory and did not address the land use policy issues. Valley Oak appealed and Protect Niles did not file a cross-appeal.

Valley Oak argues that, by failing to cross-appeal, Protect Niles forfeited an argument based on conflict with land use policies. Like the trial court, we need not address this argument because we conclude Protect Niles's arguments regarding the Project's incompatibility with the Niles HOD are properly analyzed as aesthetic impacts.

    2.    *CEQA Review of Aesthetic Impacts*

Under CEQA, it is the state's policy to "[t]ake all action necessary to provide the people of this state with . . . enjoyment of *aesthetic*, natural, scenic, and *historic* environmental qualities." (Pub. Resources Code, § 21001, subd. (b); italics added; see *id.*, § 21060.5 [defining " 'environment' " to include "objects of historic or aesthetic significance"].) Thus, "aesthetic issues are properly studied under CEQA." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 577 [reviewing cases].) As guidance for evaluation of aesthetic impacts, the CEQA Guidelines suggest agencies consider whether a proposed project would "[s]ubstantially degrade the existing *visual character* or quality of the site and its *surroundings*." (CEQA Guidelines, appen. G, § I, subd. (c), italics added [environmental checklist form].) The CEQA Guidelines specifically note that "the significance of an activity may vary with the setting." (CEQA Guidelines, § 15064, subd. (b); *North Coast Rivers Alliance v. Marin Municipal Water*

*Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 624 [lead agency may find impact significant " 'depending on the nature of the area affected' "].)

Several courts have recognized that a project's impact on the aesthetic character of a surrounding community is a proper subject of CEQA environmental review. In *Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, the court ruled an EIR was required where evidence showed a two- and three-story 120-unit senior housing facility might cause significant "changes to the physical and aesthetic conditions and character of the surrounding low-density, single-family residential neighborhood" due to the proposed facility's density and height. (*Id.* at p. 1335; see *id.* at pp. 1327–1329, 1337.) In *Pocket Protectors*, the court ruled an EIR was required where a proposed development on narrow parcels within a larger planned residential development might cause significant aesthetic impacts due to the proposed development's limited green space, minimal setbacks, and parallel rows of houses creating a tunneling or canyoning effect. (*Pocket Protectors, supra*, 124 Cal.App.4th at pp. 908–910, 936–939; see *id.* at pp. 929–936 [on similar grounds finding substantial evidence of fair argument of conflict with local land use policies].)

In *Eller Media Co. v. Community Redevelopment Agency* (2003) 108 Cal.App.4th 25, an agency's decision to prepare a supplemental EIR on a proposal to erect a billboard was affirmed in part because it "could potentially affect the visual environment" in a Hollywood redevelopment area. (*Id.* at p. 35; see *id.* at pp. 29–30, 44.) The agency further found the billboard's height and massiveness and its support structure might be incongruent with an historic building on the project site or provide an inappropriate backdrop for the scenic vista of Sunset Boulevard, a major scenic highway in the neighborhood. (*Id.* at pp. 35–36.) Similarly, the agency found the billboard's scale and character might be inappropriate in proximity to residences, a church, and playground.[7] (*Id.* at p. 35 [also finding incompatibility with adjacent land uses]; see *Friends of College*

---

[7] The agency made similar findings based on conflict with the redevelopment plan's broad goals and specific directives regarding historic buildings. (*Eller Media Co. v. Community Redevelopment Agency, supra,* 108 Cal.App.4th at pp. 32–34.)

11

*of San Mateo Gardens v. San Mateo County Community College Dist.* (2017) 11 Cal.App.5th 596, 609–611 [demolition of building and surrounding gardens might have significant adverse aesthetic impact on college campus].)

Courts have cautioned that CEQA aesthetics review should not be used to protect the views of particular persons versus the general public. (See *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 900–903 [no EIR required where neighbors urged city to preserve beauty of area but provided no evidence housing development would cause substantial adverse impact on a public view]; *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1042 [complaints that high school stadium lights would disturb peace and calm of neighborhood were evidence of aesthetic impacts only on particular persons].) Similarly, CEQA aesthetics review should not be used to secure social or economic rather than aesthetic environmental goals. (See *Porterville*, at p. 903 [concerns that project's construction quality could reduce neighboring property values was not a legitimate CEQA issue]; *Preserve Poway v. City of Poway, supra,* 245 Cal.App.4th at pp. 565–566 [objections that housing development would replace a popular horse boarding facility raised psychological or social concerns, not CEQA environmental concerns].)

Courts also emphasize that context is crucial in determining the appropriateness of CEQA aesthetic review. In *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, our colleagues in Division Four upheld a city council's decision to adopt an MND for an urban infill senior housing project and rejected an argument that an EIR was required to assess the project's aesthetic impact on the neighborhood. (*Id.* at pp. 576–577.) "[W]e do not believe that our Legislature in enacting CEQA . . . intended to require an EIR where the sole environmental impact is the aesthetic merit of a building in a highly developed area. [Citations.] To rule otherwise would mean that an EIR would be required for every urban building project that is not exempt under CEQA if enough people could be marshaled to complain about how it will look. . . . The aesthetic difference between a four-story and a three-story building on a commercial lot on a major

12

thoroughfare in a developed urban area is not a significant environmental impact, even under the fair argument standard." (*Id.* at p. 592.) "[A]esthetic issues like the one raised here are ordinarily the province of local design review, not CEQA." (*Id.* at p. 593.) However, *Bowman* added an important caveat: "[T]here may be situations where . . . an aesthetic impact like the one alleged here arises in a 'particularly sensitive' context ([CEQA] Guidelines, § 15300.2)[8] where it could be considered environmentally significant . . . ." (*Bowman*, at p. 592, italics added.) The court held no EIR was required "[b]ased primarily on the [proposed project's] environmental context"—a single senior housing facility in a mixed-use urban setting. (*Id.* at p. 576.) Here, Valley Oak proposes building a 6-acre housing complex within a designated historical district—an area the City itself has recognized as a particularly sensitive context.

The court in *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, similarly emphasized context when it upheld application of a categorical exemption to a project to add utility boxes to San Francisco sidewalks. (*Id.* at p. 1017.) The court held an "unusual circumstances" exception to the exemption was not merited based on the project's aesthetic effects even under a fair argument standard. (*Id.* at pp. 1023–1024 [applying CEQA Guidelines, § 15300.2, subd. (c)].) As in *Bowman, supra,* 122 Cal.App.4th 572, the court emphasized that " '[t]he significance of an environmental impact is . . . measured in light of the *context* where it occurs.' " (*San Francisco Beautiful*, at p. 1026, italics added.) The historic district setting at issue here is readily distinguishable.

In *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357 (*Eureka*), we rejected arguments that an EIR was inadequate

---

[8] CEQA Guideline section 15300.2, subdivision (a) provides that some of CEQA's categorical exemptions "are qualified by consideration of where the project is to be located—a project that is ordinarily insignificant in its impact on the environment may in *a particularly sensitive environment* be significant." (Italics added.) As noted *ante*, the CEQA Guidelines similarly counsel that an agency, when assessing a project's environmental impacts, should recognize that "the significance of an activity may vary with the setting." (*Id.*, § 15064, subd. (b).)

because it failed to analyze the impact of a school playground on the historical and aesthetic character of the surrounding residential neighborhood. (*Id.* at pp. 374–376.) Again, context among other factors distinguishes *Eureka* from this case. First and most importantly, the city had prepared an EIR on the project in *Eureka*, so the question before us was whether the city's finding of no significant environmental impact after mitigation was supported by substantial evidence, regardless of any substantial evidence to the contrary; here, where the city relied on an MND, the question before us is whether there was *any* substantial evidence in the record of a significant environmental impact, regardless of substantial evidence supporting the city's finding of no significant impact. "[T]his distinction is crucial for purposes of our review." (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at p. 627.)

Second, appellants in *Eureka* had made a "historical resources" impact argument not supported by the record. Although 53 locally-listed historic structures were in the 30-block neighborhood of the project, the appellants failed to show the *neighborhood itself* had been designated a historic resource or that the project would adversely impact any specific historic resource in the neighborhood. We noted that CEQA defines a significant impact on a historical resource as a change to the *physical* condition of the resource. (*Eureka, supra,* 147 Cal.App.4th at pp. 374–375; see Pub. Resources Code, § 21084.1 [defining "historical resource" and providing a "substantial adverse change in the significance of an historical resource" may be a significant effect on the environment]; CEQA Guidelines, § 15064.5, subds. (a), (b); see also *id.*, § 15064.5, subd. (b)(1), (2) [defining "substantial adverse change in the significance of an historical resource" as demolition or material alteration in the physical characteristics of the resource].) Here, Protect Niles does not argue the City failed to comply with CEQA's historical resource provisions.

Third, in *Eureka* we rejected the appellants' aesthetic impact argument because "nothing was presented in the record that established an aesthetic impact on any of" the historic structures in the neighborhood or established that the playground was "located in a 'particularly sensitive' context. (See [CEQA] Guidelines, § 15300.2.)" (*Eureka, supra,*

14

147 Cal.App.4th at p. 375, fn. omitted; see *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist., supra,* 215 Cal.App.4th at pp. 1043–1045 [rejecting argument that project would have adverse aesthetic impact on alleged historical district where district never was recognized by city and no evidence district would be materially impaired].)  Here, as discussed *post*, there was substantial evidence of an adverse impact on the unusual setting of the Niles HOD, as mapped and officially recognized by the City.

Finally, in *Eureka* we rejected the appellants' argument that the "playground structure was 'enormous and garish' and 'wholly inappropriate for this site' " and thus would have a significant adverse environmental impact.  (*Eureka, supra,* 147 Cal.App.4th at p. 376.)  "[T]he CEQA issue of aesthetics is not the judging of the individual beauty of the [playground], but rather the physical elements of the preexisting environment [it] may significantly impact."  (*Ibid.*)  Here, while many of public comments on the Project criticized the aesthetics of the Project independent of its setting, Protect Niles's litigation argument rests on the Project's aesthetic impact on the *setting*, i.e., the Niles HOD.

In sum, we conclude a project's visual impact on a surrounding officially-designated historical district is appropriate aesthetic impact review under CEQA.  We do not believe this view undermines the separate scheme for CEQA review of environmental impacts on historical resources.  (See Pub. Resources Code, § 21084.1; CEQA Guidelines, § 15064.5(a), (b).)  As noted, those rules focus on direct physical changes to historical resources themselves that materially impair those resources' historical significance, not a project's aesthetic impact on its historical setting.[9]  (See *Eureka, supra,* 147 Cal.App.4th at pp. 374–375.)  We do not believe the Legislature intended CEQA review to overlook a project's aesthetic impact on a historical district where the

---

[9] Although CEQA Guidelines section 15064.5, subdivision (b)(1) refers to physical change of "the resource or its immediate surroundings," subdivision (b)(2) defines material impairment only in terms of physical changes to the resource itself.  The governing statute, Public Resources Code section 21084.1, does not refer to immediate surroundings.

15

Legislature expressly provided that CEQA addresses projects' aesthetic and historic environmental impacts (Pub. Resources Code, § 21001, subd. (b)), specified that any objects of historical or aesthetic significance are part of the environment (*Id.*, § 21060.5), and intended that CEQA be liberally construed to afford the fullest possible protection to the environment (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390).

3. *Substantial Evidence of Aesthetic Impact on Niles HOD*

Here, substantial evidence clearly supported a fair argument the Project would have an adverse aesthetic impact on the Niles HOD.

As noted *ante*, the initial study concluded the Project is aesthetically compatible with the Niles HOD because it reflects the architectural style of the industrial buildings that previously occupied the site and the HOD Guidelines recognize eclectic architecture within the district. During public hearings on the Project, Valley Oak defended the Project's aesthetics in similar terms and cautioned that "false historicism is the worst way to honor the past." Some City officials echoed these sentiments.

HARB, however, opined that the Project was inconsistent with the Niles HOD because of its height, density and massing, as well as its architectural style. HARB member Shaiq opined that the Project "did not compl[e]ment Niles because of its density," which would take away "the small town feeling" of Niles. HARB member Adamson said "something 'village-ie' would be best," with less density and more open space. HARB chairperson Price said, "Architectural features should have some significance with current historical features in Niles" but "[m]ost important" is "density . . . in keeping with the HOD." Niles residents echoed these views. One argued the "[HOD] Guidelines emphasized scale and a view to the hills. The height of the buildings should be both one and two stories. . . . Niles was about a small town feel." Another said the "modern, high-tech look" of the Project was not an "appropriate entrance to the core of the current downtown Niles [HOD]." Still another resident agreed that "the gateway should say that this is what you'll get when you enter downtown." Other resident comments were that "the architecture was interesting, but not right for Niles"; "the

16

cannery design was actually beautiful, but the rest was not appropriate for Niles"; and a "more traditional look should be used to blend" into the adjacent neighborhood.

Despite Valley Oak's promises to modify the Project, residents and some City officials nevertheless continued to find the Project incompatible with the Niles HOD. Planning Commissioner Leung said the design was "really contemporary" and "too far away from where Niles is" aesthetically. Commissioner Bonaccorsi said the "sea of 30[-foot] houses" was a different look from the former industrial buildings on the site. Niles resident Scott Rogers said the Project "doesn't look like Niles," and Niles resident Deni Caster said the Project's "design factors in a historical area demand your attention." Even after the Project was modified in response to the planning commission's conditions, similar opinions were voiced. City Councilmember Bacon said the Project "failed to relate the historic character of Niles" and "clearly does not match the character of what we have in Niles." He observed, "when you have 24 garages in a row and three-story developments you have a canyon effect," and reduced massing would "give it a much different character." Niles resident Al Menard said, "This is too modern of a site for a historic district. . . . [P]eople when they come underneath the railroad tracks they see a historic venue that they know . . . is part of the historic community of Niles. And if we don't do that we've lost a lot of our integrity and a lot of our history." Niles resident Dorothy Bradley urged the city council to "please downsize the project. It's too much for Niles." Niles resident Kimberly Harbin complained "there doesn't seem to have been much of an effort at all to make the architecture fit into what we consider the small town, Norman Rockwell charm that is Niles." In short, opinion differed sharply as to the Project's aesthetic compatibility with the historic district.

We recognize that aesthetic judgments are inherently subjective. (See *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402.) But "[p]ersonal observations on these nontechnical issues can constitute substantial evidence." (*Ibid.*) Here, the comments about incompatibility were not solely based on vague notions of beauty or personal preference, but were grounded in inconsistencies with the prevailing building heights and architectural styles of the Niles HOD

17

neighborhood and commercial core. (Cf. *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1352 ["[u]nsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence"].) HARB, the board specifically charged with assessing compatibility with the Niles HOD and presumably comprised of persons with some expertise in historic aesthetics, overwhelmingly voted to deem the design incompatible based in part on its "massing, scale, size," which was never significantly modified. (Cf. *Pocket Protectors, supra,* 124 Cal.App.4th at pp. 931–932 [planning commissioners' fact-based opinions based on planning expertise were substantial evidence for fair argument].) Although the Project was modified somewhat following the HARB meeting, the density and architectural style of the Project were never changed such that HARB's criticisms became irrelevant. (See *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist., supra,* 11 Cal.App.5th at p. 610 ["comments remained relevant after the revised addendum" to an MND where relevant facts had not changed].) Moreover, many of the conditions added to the Project approvals by the city council were merely precatory and not added as required *CEQA mitigation* measures to reduce an environmental impact to less than significant.

Valley Oak argues the Project cannot plausibly result in an adverse aesthetic impact on its surroundings because it is being upgraded from a dilapidated vacant lot to attractively landscaped new construction. On this theory, construction of any nature or character within the Niles HOD could not plausibly have an adverse aesthetic effect on the historic district because the project would presumably be more attractive than a vacant lot. We reject that categorical approach.

Valley Oak suggests the Project's impact on the HOD cannot be significant because the Project site is on the edge of the district and outside its commercial core. However, "[t]he significance of an environmental impact is not based on its size but is instead ' "measured in light of the context where it occurs." ' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist., supra,* 11 Cal.App.5th at p. 610 [aesthetic impact of removing campus gardens potentially

18

significant because gardens were "unique," even though loss of total landscaped and open space would have been less than one-third of one percent].)  The Project site is at a recognized "gateway" to the Niles HOD, it abuts the commercial core and extends the commercial strip, and it lies entirely within the historical district.

Valley Oak also argues "the mere conclusion of an advisory body like HARB does not by itself constitute substantial evidence to support a fair argument of a significant environmental impact.  (*Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424, 435–436.)"  In *Perley*, the county planning commission had ordered preparation of an EIR, but the board of supervisors overruled its decision on appeal and approved the project after adopting an MND.  (*Id.* at p. 429.)  The Court of Appeal affirmed the denial of a petition to overturn the board's decision, noting that the plaintiff had failed to point to specific evidence in the record that would support a fair argument of significant environmental effects.  The plaintiff had cited the fact that "the planning commission came to a different conclusion tha[n] the board."  (*Id.* at pp. 434–435.)  The court wrote, "The commission's *conclusions* from the evidence presented to it do not themselves constitute *evidence* of such effects."  (*Id.* at p. 435.)  Here, Protect Niles does not rely alone on the HARB *vote* as evidence of a significant aesthetic impact, but also cites board members' underlying aesthetic judgments about the effect of the Project.  Other courts have distinguished *Perley* on similar grounds.  (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1115–1116 [advisory historic board's fact-based determination of historic status was substantial evidence supporting a fair argument project would destroy historic resource]; *Pocket Protectors, supra,* 124 Cal.App.4th at p. 934 [planning commission's factual findings of conflict with land use policies was substantial evidence of fair argument of significant impact].)  In our view, HARB members' collective opinions about the compatibility of the Project with the Niles HOD are substantial evidence in this record of the Project's potentially significant aesthetic impacts.[10]

_____

[10] Valley Oak also argues that relying on the views of HARB *advisory* board members to find substantial evidence of a fair argument would undermine the city council's authority to make the final *decision* on environmental impacts.  This argument

19

We recognize few if any comments during hearings on the Projects specifically argued an MND was inappropriate and an EIR was necessary. However, Valley Oak does not contend the aesthetic impacts issue was not administratively exhausted. We also recognize that because aesthetics is an inherently subjective assessment the City could well act within its discretion if, after preparation of an EIR, it concludes the Project will have no significant aesthetic impact on the historical district. Our role here, however, is not to anticipate whether an ultimate evaluation by the City, one way or the other, might be supported by substantial evidence. Our function is to ensure the CEQA environmental review process serves its purpose of facilitating informed decision-making with public participation on environmental issues. Preparation of an EIR will facilitate the informed self-government process of evaluating the Project's aesthetic impact on the Niles HOD. An EIR will describe the Project's compatibility with the Niles HOD, assess the adequacy of proposed mitigation measures, discuss possible alternative designs, and assess their feasibility.[11] (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2018) §§ 11.9–11.13, pp. 11-7 to 11-8.)

D.   *Traffic Impacts*

Valley Oak argues the trial court erred in ruling substantial evidence supports a fair argument of significant traffic impacts from the Project. In the trial court, Protect Niles's argument on the traffic issue consisted almost entirely of quotes from the record—comments made by residents, City officials or staff, and professional consultants—expressing concerns about traffic impacts caused by the proposed New Street/Niles intersection.[12] We agree with the trial court that these fact-based

confuses the lead agency's authority to make the *ultimate* significant impact findings after appropriate environmental review with the agency's responsibility to *initially* prepare an EIR if there is a fair argument of a significant environmental impact.

[11] Tellingly, the planning commission and city council attempted to prematurely engage in this process by discussing the economic feasibility of Project alternatives based on informal discussions with Valley Oak.

[12] Protect Niles incorporates most of these quotes into its respondents' brief on appeal as well.

comments constituted substantial evidence supporting a fair argument the Project will have significant adverse traffic impacts.

     1.    *Background*

The Niles HOD is bordered by Alameda Creek to the south and west and by Mission Boulevard to the north and east (a four- to six-lane major arterial, traveling in an east-west direction). Niles Boulevard (a two-lane minor arterial street) traverses Niles, connecting with Mission Boulevard (Niles/Mission intersection) east of Niles and becoming Alvarado-Niles Road west of the Niles commercial core on the way to Union City.[13]

Heading westbound from the Niles/Mission intersection, Niles Boulevard narrows, with a low speed limit, to pass under a railroad trestle before making a hard right along the eastern side of the Project site. Niles Boulevard continues west to the Niles commercial core. Valley Oak plans to add angled parking along the Project's Niles Boulevard frontage. Exit from the angled parking spaces would require drivers to back into the eastbound lane of Niles Boulevard.

The traffic study analyzed traffic flow at the proposed location of the New Street/Niles intersection and congestion at nearby intersections, including Niles/Mission. Relying on trip generation rates for residences and quality restaurants taken from the Institute of Transportation Engineers publication, *Trip Generation* (9th edition), the study estimated the Project would generate 785 daily trips (including 569 generated by the Project's dwelling units). When rerouted traffic from the adjacent neighborhood was factored in, the study projected 55 morning peak hour trips through the New Street/Niles intersection and 78 during the evening peak hour.

On safety and traffic flow at the New Street/Niles intersection, the study concluded a left-turn pocket lane on westbound Niles Boulevard was warranted under national guidelines. However, City staff decided not to require a left-turn pocket lane for

---

[13] We take judicial notice of the general geography of the Fremont area. (Evid. Code, § 452, subd. (h).)

21

two reasons. First, "without a left-turn pocket, this intersection would operate much like the existing intersections in downtown Niles . . . where left-turn vehicles on Niles Boulevard share a single lane with the vehicles traveling through. [One such downtown] intersection . . . operates adequately, yet it has a greater number of left turns than those estimated for the [New Street/Niles intersection]." Second, "[h]aving no left-turn pocket at the [New Street/Niles intersection] would help to slow down vehicles as they enter downtown Niles." The traffic study also assessed visibility at the intersection. Relying on the posted speed limit of 25 miles per hour on Niles Boulevard, it determined the minimum acceptable sight distance at the intersection would be 150 feet and recommended the City require the Project design ensure such sight distance. As noted *ante*, the MND included such a mitigation measure.

The traffic study also assessed whether the Project would cause increased congestion at nearby intersections. As relevant here, it concluded the level of service at the Niles/Mission intersection would deteriorate from an already "unacceptable" E level of service to a lower F level of service. However, the amount of deterioration would be less than the City's predetermined thresholds of significance for signalized intersections. (See CEQA Guidelines, § 15064.7.)

The initial study incorporated the traffic study's analyses and concluded the Project would have less than significant traffic impacts with mitigation to ensure adequate sight distance at the New Street/Niles intersection.

2. *Left-Turn Pocket Lane*

Residents and City officials expressed concern that, without a left-turn pocket lane at the New Street/Niles intersection, westbound drivers on Niles Boulevard taking the hard-right turn might run into cars queued up to turn left into the Project. As City Councilmember Bacon said, "[I]f there were three or four vehicles queuing and trying to make that left turn, . . . you'd have very little room for someone coming around that corner . . . [V]isibility is quite bad." He called it "a blind turn" and a "pretty dangerous" situation. City Councilmember Jones observed that westbound drivers on Niles Boulevard "have a tendency as they make the right turn [after the railroad underpass],

22

they hit the gas." The City Community Development Director Jeff Schwob agreed that speeds on Niles Boulevard generally are a concern: "I would say people drive way too fast down Niles Boulevard. . . . Whether they're going to pick up enough speed right there around the corner, I don't know. But once you [are into the commercial core], it's like 'oh my gosh.' " Niles resident Dorothy Bradley stated: "I live on Niles Boulevard . . . and they raised the speed limit from 35 to 40 miles an hour on a short strip and . . . believe me, people go flying by my house at 45 and 50 miles per hour before they reach the overpass into Union City," apparently referring to a portion of Niles Boulevard to the west of the Niles commercial core. Niles resident Roger Marshall criticized the traffic study's reliance on the downtown intersection, noting a substantial difference in the westbound approaches to the two intersections, and faulted the study for not taking into account the Project's new angled parking would require motorists to back into Niles Boulevard.[14]

These *fact-based* comments are substantial evidence supporting a fair argument that the New Street/Niles intersection will create traffic safety hazards due to excessive queueing in the westbound lane, a tendency of westbound drivers to exceed the posted speed limit, and limited visibility around the 90-degree curve. Significantly, even the traffic study's author acknowledged a left-turn pocket lane was warranted by engineering standards. Although he insisted the intersection was safe without the pocket lane, his analysis of the intersection was based at least in part on the posted speed limit despite ample evidence that speed limits were often exceeded in that area. Moreover, the reasons City staff did not require the left-turn pocket lane—a concern about the character of the district and a desire to slow traffic down as it entered the commercial core—reflected a balancing of the risks and benefits of the proposed safety measure in comparison to other goals. This is the sort of evaluation that should *follow* preparation of an EIR, not justify reliance on an MND. In any event, the city council added a Project approval condition

_____

[14] Marshall apparently supported his critique with personal observations that are not in the record: "This afternoon I observed traffic conditions near the curve where Niles Boulevard goes under the [railroad trestle]. (See attached table)."

(*not* a CEQA mitigation measure) that merely required Valley Oak to "work with" City staff on the issue with a goal of adding the left-turn pocket lane *if* there was a sufficient right-of-way—no alternative measures were considered or mandated if not.

3.    *Congestion on Niles Boulevard and at Niles/Mission*

Another traffic concern raised during the public review process was increased congestion on Niles Boulevard including the Niles/Mission intersection, which might arise due to both additional traffic from Project residents and interference with traffic flow caused by drivers backing out of the angled parking places. Niles residents Renee Guild and Ken Morjig respectively reported the Niles/Mission intersection was already "a disaster waiting to happen" and "a bad issue." Niles resident Deni Caster stated that even without the Project, "I have been in stopped traffic that is backed [into the center of the commercial core] in the morning, trying to exit onto Mission Boulevard." Thus, Caster described a pre-existing traffic back-up on Niles Boulevard between the commercial core and Niles/Mission intersection directly affecting the Project's Niles Boulevard frontage. Niles resident Jennifer Emmett similarly stated: "I travel down Niles [Boulevard] in the direction of the [Project] every day. Many mornings traffic is already backed up past the border of the [Project site] nearly to downtown. . . . [Drivers are] waiting 5 minutes to get just from the [railroad] underpass to Mission Boulevard most mornings." Another Niles resident Kimberly Harbin said, "I live on Niles Boulevard itself and backing out of the driveway in the morning, it's already difficult. I especially am thinking of people coming out from that are [*sic*[15]] and then nipping down through Niles Boulevard and getting stuck [west of the commercial core]."

These fact-based comments by residents support a fair argument that the Project would have a significant adverse impact on traffic congestion on Niles Boulevard in the vicinity of the Project. Residents' personal observations of traffic conditions where they live and commute may constitute substantial evidence even if they contradict the conclusions of a professional traffic study. (See *Keep Our Mountains Quiet v. County of*

---

[15] Harbin was apparently referring to the Project.

*Santa Clara* (2015) 236 Cal.App.4th 714, 735–736 & fn. 13.) This is especially true where, as here, residents cite specific facts that call into question the underlying assumptions of a traffic study.

In any event, even assuming the traffic study's trip estimates are accurate, the study acknowledged an existing "unacceptable" level of service at Niles/Mission intersection and predicted it would further deteriorate with the Project's addition, but not beyond the City's predetermined thresholds of significance. Valley Oak argues the trial court improperly ignored the thresholds of significance and held the deterioration of service from level E to F itself supports a fair argument of traffic impacts. In concluding substantial evidence supports a fair argument of significant traffic impacts, we do not rely solely on the undisputed deterioration from level E to F.[16] Rather, we do not agree with Valley Oak that the significance thresholds necessarily *shield* the City from the EIR requirement. Thresholds of significance may not be applied "in a way that forecloses the consideration of any other substantial evidence showing there may be a significant effect." (*Communities for a Better Environment v. California Resources Agency, supra,* 103 Cal.App.4th at p. 114, disapproved on other grounds by *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.) By their very nature, thresholds of significance address average congestion impacts at signalized

---

[16] Valley Oak argues the trial court improperly "developed on its own initiative" the argument that the deterioration from level E to F itself constituted substantial evidence of adverse traffic impacts. Valley Oak contends the argument is foreclosed by the plaintiffs' failure to exhaust their administrative remedies by raising it in the administrative proceeding. (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at pp. 623–624.) Because we do not adopt the trial court's position, we need not address the exhaustion argument. However, we note that the deterioration from level E to F was expressly mentioned by one speaker in the administrative proceedings as one indication of adverse traffic impacts, and other speakers described already-unacceptable levels of congestion in the approach to the Niles/Mission intersection. In our view, these comments were sufficient to put the City on notice as to the residents' concerns about the Project's possibly worsening already-congested conditions on Niles Boulevard, as is reflected in the traffic study. (See *id.* at p. 623 [comments must express concerns so lead agency has opportunity to evaluate and respond].) These comments were cited in Protect Niles's petition to the trial court.

intersections in the City.[17]  The fact-based comments of residents and City staff and officials supported a fair argument that unusual circumstances in Niles might render the thresholds inadequate to capture the impacts of congestion on Niles Boulevard extending from the Niles/Mission intersection well into the Niles HOD commercial core.  Residents aptly described Niles as "geographically cut off from the rest of Fremont," which might cause congestion effects atypical of the City.  Also, Niles Boulevard serves as the main street of the commercial core of the Niles HOD, such that congestion arguably adversely affects the character of the historical district, another unusual impact.

In sum, we conclude substantial evidence supports a fair argument that the Project would have significant adverse aesthetic and traffic impacts and therefore affirm the trial court.

### III.    DISPOSITION

The judgment is affirmed.  Valley Oak shall bear Protect Niles's costs on appeal.

---

[17] The traffic study implies the thresholds of significance are generally applicable to environmental review of development projects and were not adopted specifically for the Project or for the Niles area.

26

 

_____
BRUINIERS, J.


WE CONCUR:


_____
SIMONS, Acting P. J.


_____
NEEDHAM, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PROTECT NILES et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF FREMONT et al.,<br><br>     Defendants and Respondents;<br><br>DOUG RICH et al.,<br><br>     Real Parties in Interest and<br>     Appellants. | A151645<br><br>(Alameda County<br>Super. Ct. No. RG15765052)<br><br>**ORDER CERTIFYING OPINION<br>FOR PUBLICATION** |

THE COURT:

       The opinion in the above-entitled matter filed on July 16, 2018, was not certified for publication in the Official Reports.  For good cause appearing, pursuant to California Rules of Court, rule 8.1105(b), (c), the opinion is certified for publication.

Date_____         _____Acting P.J.

Superior Court of Alameda County, No. RG15765052, Frank Roesch, Judge.

Sheppard Mullin Richter & Hampton, Arthur J. Friedman, Alexander L. Merritt; Allen Matkins Leck Gamble Mallory & Natsis and David H. Blackwell for Real Parties in Interest and Appellants.

Brandt-Hawley Law Group and Susan L. Brandt-Hawley for Plaintiffs and Respondents.

No appearance for Defendants and Respondents.